569

**STATE of Minnesota, Respondent,**

**v.**

**Joel Marvin MUNT, Appellant.**

**No. A11–2315.**

Supreme Court of Minnesota.

May 31, 2013.

Lori Swanson, Attorney General, John B. Galus, Assistant Attorney General, Saint Paul, MN; and Ross E. Arneson, Blue Earth County Attorney, Mankato, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Richard Schmitz, Assistant State Public Defender, Saint Paul, MN, for appellant.

## OPINION

DIETZEN, Justice.

Appellant Joel Marvin Munt was indicted by a Blue Earth County grand jury of four counts of first-degree murder, one count of second-degree murder, two counts of first-degree aggravated robbery, three counts of second-degree assault, three counts of kidnapping, and three counts of criminal vehicular operation causing injury, arising out of the shooting death of his ex-wife Svetlana and the kidnapping of their three children. Because Munt pleaded not guilty and not guilty by reason of mental illness, the district court bifurcated the trial. The jury found Munt guilty of all counts and rejected his not-guilty-by-reason-of-mental-illness defense. On direct appeal, Munt argues that the district court erred by: (1) declining to remove a prospective juror for cause; (2) making allegedly improper comments to the jury; (3) denying his request to testify on surrebuttal; (4) determining that his 9–year–old daughter was incompetent to testify; and (5) failing to inquire into the nature of his pretrial complaints about counsel appointed to represent him. Munt also raises various pro se claims. Because we conclude that the district court did not commit error and Munt's pro se claims lack merit, we affirm.

Joel Munt met Svetlana through a Russian internet dating service. Munt traveled to Russia twice to visit Svetlana; during the second visit, the two were married. Subsequently, the couple returned to Minnesota and had three children: J.L.M., M.M.M., and M.L.M.

In early October 2006, Svetlana reported to the police that Munt had been abusing her. Around the same time, O.S., a friend of Svetlana's, received repeated phone calls from Svetlana indicating that she was frightened for her life. Svetlana removed herself and her children from the home and moved to the CADA house, a domestic-abuse shelter located in Mankato. Munt then initiated divorce proceedings, alleging that Svetlana had been mistreating their children. According to Munt, Svetlana gave the children scalding baths, shoved J.L.M. off a toy train, and locked the children in their rooms.

The district court granted Munt temporary custody of the children and Svetlana visitation rights. Later, the arrangement changed to 50/50 split custody. In October 2008, Munt refused to return the children to Svetlana after a scheduled visitation ended because he alleged that she physically abused the children. After a hearing, the district court found Munt in contempt, terminated his custody rights, and limited his contact with the children to supervised visitation at the CADA house.

The murder occurred during Munt's scheduled visitation with his three children on March 28, 2010. It was Svetlana's habit to arrive early at Rasmussen Woods park and then drive to the CADA house at the scheduled time. Munt also first drove to the park, where he encountered Svetlana and the children sitting in Svetlana's Chevrolet Cavalier. Munt drove his Chevrolet Suburban toward the driver's side of Svetlana's car and smashed into the car, pinning it against a tree. Munt then exited his car and shot Svetlana four times in the head with a pistol.

Several witnesses observed Munt shortly after the collision and shooting. T.B., who was walking his dog along a trail in the nearby woods, heard a loud crash, gunshots, and what sounded like a woman screaming. T.B. raced to the scene and observed the Suburban had "t-boned" the Cavalier. As T.B. approached the scene, he encountered Munt, who was standing next to the Cavalier. Munt pointed his gun at T.B. and threatened to kill him. T.B. fled the scene and called 911 on his cell phone.

M.D. and C.D., who were returning home from church with their three children in a Yukon Denali, observed smoke rising from the Rasmussen Woods park. They approached the Cavalier and discovered M.L.M. with a bloody face and M.M.M. crying hysterically. As M.D. and C.D. moved to help the children, Munt walked toward C.D. with his gun and threatened, "I will f***ing kill you." Similarly, Munt pointed his gun at M.D. and stated, "[L]eave my kids alone or I am going to f***ing kill you." Munt then took the keys to the Yukon Denali, loaded his three children inside, and drove out of the park.

A Blue Earth County Sheriff's Deputy responded to a 911 call and stopped Munt. Officers arrested Munt and found in his pockets three knives and a magazine containing .45–caliber bullets. In the vehicle, officers discovered a Ruger P90 pistol, with its safety off and hammer cocked, and an empty magazine. Forensic analysis later determined that the pistol was the gun used to shoot Svetlana.

Officers also found the three children seated in the rear of the vehicle. J.L.M., the oldest of the three, said: "Mommy's dead ... Daddy killed her. Daddy had a gun." The children were transported by ambulance to the hospital. M.L.M., the youngest child, sustained the most significant injuries, suffering trauma to the face. Several pieces of glass became imbedded in the child's face. M.L.M. underwent four surgeries to remove the glass and repair the scarring.

A Blue Earth County grand jury indicted Munt with the following 17 counts: one count of first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2012); two counts of first-degree felony murder, Minn.Stat. § 609.185(a)(3); one count of first-degree domestic abuse murder, Minn. Stat. § 609.185(a)(6); one count of second-degree intentional murder, Minn.Stat. § 609.19, subd. 1(1) (2012); one count of drive-by shooting, Minn.Stat. § 609.66, subd. 1e(a), (b) (2012); two counts of first-degree aggravated robbery, Minn.Stat. § 609.245, subd. 1 (2012); three counts of second-degree assault, Minn.Stat. § 609.222, subd. 1 (2012); three counts of kidnapping, Minn.Stat. § 609.25, subd. 1(2) (2012); and three counts of criminal vehicular operation causing injury, Minn.Stat. § 609.21, subd. 1(1) (2012). Munt pleaded not guilty and not guilty by reason of mental illness, and the case proceeded to a bifurcated jury trial.

During phase one of the trial, the State presented evidence consistent with the facts described above. The State also called Munt's fiancée, T.S., who testified that Munt called her on the day of the shooting and told her: "Svetlana is dead." T.S. asked Munt to explain what he meant, and he replied, "I drove my truck into her car and I shot her, she's dead."

Munt denied that he planned or intended to kill Svetlana. He testified that, when he arrived at the park on the day of Svetlana's death, some entity, which he described as "it," seized control of his body. He explained that he watched helplessly as "it" caused him to crash into Svetlana's car and shoot her. According to Munt, he was not "back in [his] body"

until after he was arrested. Additionally, Munt's former employer, J.S., testified that he and Munt had made plans to meet for lunch after Munt's visit with the children. J.S. stated that Munt called him en route to the visitation to confirm their lunch plans for that afternoon.

At the end of phase one, the district court submitted to the jury the 17 counts charged in the indictment as well as the lesser offense of first-degree heat-of-passion manslaughter, Minn.Stat. § 609.20(1) (2012). The jury found Munt guilty of the 17 indicted counts, but acquitted him of heat-of-passion manslaughter.

During phase two of the trial, the State called Dr. Sheryl Delain, the court-appointed forensic psychologist. Dr. Delain testified that Munt may have been clinically depressed when he shot Svetlana, but his mental state would not have prevented him from knowing the nature or wrongfulness of his acts. Munt called Dr. Allen Coursol, a licensed psychologist. Dr. Coursol testified that Munt suffered from major depression and paranoid personality disorder, but agreed with Dr. Delain that Munt was able to understand the nature and wrongfulness of his acts at the time of the offense.

The jury rejected Munt's mental illness defense. The district court then convicted Munt of first-degree premeditated murder and imposed a life sentence without the possibility of release. Additionally, the district court convicted Munt of first-degree aggravated robbery, second-degree assault, kidnapping, and criminal vehicular operation causing injury, and imposed sentence.

### I.

■ Munt raises five issues on appeal and asserts various pro se claims. Munt first argues that the district court erred when it declined to remove prospective juror B.S. for cause. According to Munt, B.S. expressed actual bias against his mental illness defense in response to a question during voir dire. Consequently, Munt argues, the district court deprived him of the right to a fair trial by an impartial jury when it denied his challenge for cause against B.S.

■ We review the district court's denial of a challenge for cause for an abuse of discretion. *State v. Barlow,* 541 N.W.2d 309, 312 (Minn.1995). Our review of the district court's determination of juror impartiality is especially deferential. *State v. Drieman,* 457 N.W.2d 703, 708–09 (Minn. 1990). That determination depends largely on the prospective juror's demeanor, and "[d]emeanor plays a fundamental role not only in determining juror credibility, but also in simply understanding what a potential juror is saying." *Patton v. Yount,* 467 U.S. 1025, 1038 n. 14, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). In contrast to appellate review of a cold transcript, the district court stands in the best position to hear the juror's testimony, observe her demeanor, and evaluate her ability to be impartial. *Drieman,* 457 N.W.2d at 708–09. This is why the United States Supreme Court has described the deference due to the district court's determination of juror impartiality as being "at its pinnacle." *Skilling v. United States,* —— U.S. ——, 130 S.Ct. 2896, 2923, 177 L.Ed.2d 619 (2010).

■ The United States and Minnesota Constitutions guarantee a criminal defendant the right to a fair trial by an impartial jury. U.S. Const. amend. VI; Minn. Const. art. I, § 6; *see also Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *State v. Greer,* 635 N.W.2d 82, 87 (Minn.2001). Minnesota Rule of Criminal Procedure 26.02, subdivision 5, provides, among other grounds, that a party

may seek to have a prospective juror removed if "[t]he juror's state of mind—in reference to the case or to either party—satisfies the court that the juror cannot try the case impartially and without prejudice to the substantial rights of the challenging party." Minn. R.Crim. P. 26.02, subd. 5(1). Put differently, the challenging party has the burden of proving that the juror expressed a "state of mind" demonstrating "actual bias" towards the case or either party. *See State v. Brown,* 732 N.W.2d 625, 629 n. 2 (Minn.2007); *State v. Williams,* 593 N.W.2d 227, 238 (Minn.1999)(stating that the challenging party bears the burden to prove actual bias).

■ To establish that the prospective juror expressed actual bias, the challenging party must identify more than "the mere existence of any preconceived notion as to the guilt or innocence of an accused." *Dowd,* 366 U.S. at 723, 81 S.Ct. 1639. Rather, the challenging party must show that the juror exhibited "strong and deep impressions" that would prevent her from "lay[ing] aside [her] impression or opinion" and "render[ing] a verdict based on the evidence presented in court." *Id.* at 722–23 & n. 3, 81 S.Ct. 1639 (citation omitted) (internal quotation marks omitted).

With these principles in mind, we examine whether the district court abused its discretion in this case. During voir dire, defense counsel elicited from B.S. that she interned as a phlebotomist at the psychiatric hospital in St. Peter, and that she did not know anyone who suffered from mental illness. Defense counsel passed B.S. for cause. The prosecutor then engaged in the following colloquy with B.S.:

> Q: I just want your opinion; what—in general what do you think if somebody comes into court and says, yeah I did it but I am mentally ill and—you know—I am really not responsible for what I did, what's—what's your thought on that?
>
> A: My personal opinion about it [is] if you confess then you are aware that you did [it], so basically mental illness or not you are [aware] of what you did so you should be held responsible.

Based solely on that question and answer, Munt argues that B.S. expressed actual bias against his mental illness defense.

We conclude that Munt has failed to establish that B.S. expressed actual bias in the answer she gave to the question regarding mental illness. Two reasons support our conclusion. First, B.S.'s answer itself does not rise to the level of actual bias. Munt's argument assumes that B.S.'s use of the phrase "mental illness" was a reference to the mental illness defense codified in Minn.Stat. § 611.026 (2012). The statute incorporates the *M'Naghten* standard and provides that a person who is "mentally ill or mentally deficient" shall not be excused from criminal liability except upon proof that "at the time of committing the alleged criminal act the person was laboring under such a defect of reason" so "as not to know the nature of the act, or that it was wrong." Minn.Stat. § 611.026; *see also State v. Odell,* 676 N.W.2d 646, 648 (Minn.2004). The record, however, does not support Munt's assumption that B.S. intended her use of the phrase "mental illness" to mean the *M'Naghten* standard. Notably, the prosecutor did not explain to B.S. that he intended "mental illness" in his question to mean the *M'Naghten* standard.

Moreover, the district court did not explain to the prospective jurors before voir dire that the mental illness defense has a specialized meaning that is codified in statute and that incorporates the *M'Naghten* standard. This is significant because the *M'Naghten* standard identifies a subset of mental illnesses that is narrower than the

general understanding of "mental illness." Specifically, the plain and ordinary meaning of "mental illness" is: "Any of various conditions characterized by impairment of an individual's normal cognitive, emotional, or behavioral functioning, and caused by social, psychological, biochemical, genetic, or other factors, such as infection or head trauma." *The American Heritage Dictionary* 1098 (4th ed.2006). Thus, the ordinary meaning of "mental illness" is broad, and covers many conditions including personality disorders, mood disorders, such as depression, anxiety disorders, dissociative disorders, as well as psychotic disorders. *See generally* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.2000). Because there is no evidence that B.S. was aware of the legal meaning and requirements of the mental illness defense in section 611.026, we cannot conclude that her answer itself demonstrated a strong and deep impression that closed her mind against Munt's mental illness defense.[1]

■ Second, B.S.'s answer, when read together with her other answers during voir dire, does not demonstrate actual bias. In determining whether a prospective juror expressed actual bias, other courts have examined the juror's challenged answer within the context of the entire voir dire testimony to understand what the juror meant by the answer. *See People v. Young,* 16 P.3d 821, 824 (Colo.2001) (emphasizing that "[a]n appellate court must review the entire voir dire at issue when reviewing a trial court's ruling on a challenge for cause in order to place the juror's statement in context"); *People v. Terrell,* 185 Ill.2d 467, 236 Ill.Dec. 723, 708 N.E.2d 309, 320 (1998)(stating that "the entire voir dire of the potential juror must be considered, rather than selected statements," when determining the juror's impartiality (italics omitted)); *People v. Willard,* 226 A.D.2d 1014, 641 N.Y.S.2d 896, 900 (1996)(concluding that the prospective juror did not express actual bias "in the context of the entire voir dire" because the juror unequivocally stated at the beginning of voir dire that he could render an impartial verdict). We agree that a juror's answer must be viewed in context to determine whether it demonstrated actual bias.

Here, the district court informed the prospective jurors at the start of voir dire that Munt was asserting a mental illness defense. The district court subsequently asked B.S. whether she would "be able to follow all of [its] instructions on the law?" B.S. answered: "Yes." The district court

---

1. The dissent contends that B.S.'s use of the words "if you confess then you are aware that you did [it]" reflects a belief that Munt is criminally liable even if he became aware of the nature and wrongfulness of his conduct *after the fact.* But the record does not support such an assumption. The term "confession" is commonly understood to mean a criminal defendant's "acknowledgement of guilt, often including details about the crime." *Black's Law Dictionary* 317 (8th ed.2004). It is unclear what B.S. intended the word "confess" to mean as it relates to a defendant's awareness of the nature and wrongfulness of his conduct. B.S. could have expressed a belief that a defendant who confesses was likely aware of his conduct at the time he committed the crime. Alternatively, B.S. could have expressed a belief that a defendant who confesses became aware of his conduct after he committed the crime. The former belief is consistent with *M'Naghten;* the latter is not. *See Odell,* 676 N.W.2d at 648 (explaining that a defendant cannot prevail on a mental illness defense if he was aware of the nature of the crime or that it was wrong at the time he committed the crime). By concluding that B.S. did not express actual bias, the district court implicitly determined that B.S. intended the former meaning of "confess." That determination depended on B.S.'s demeanor and credibility, and we therefore defer to that determination. *See Patton,* 467 U.S. at 1038 n. 14, 104 S.Ct. 2885.

further asked B.S. whether she knew "of any other reason why [she] could not render a fair and impartial verdict in this case?" B.S. responded: "No." In other words, B.S. stated clearly and unequivocally that she would try the case impartially based on the court's instructions on the law and the evidence presented at trial. Thus, B.S.'s answer regarding the mental illness defense—in context with her other voir dire testimony—does not indicate an inability or unwillingness to set aside her personal opinion and fairly evaluate Munt's mental illness defense. Because the district court was in the best position to evaluate B.S.'s credibility, we defer to the court's determination that B.S. did not express actual bias. *See Patton,* 467 U.S. at 1038 n. 14, 104 S.Ct. 2885.

Our conclusion is further supported by the manner in which the issue was presented to the district court. After B.S. answered the prosecutor's question, defense counsel asked to approach the bench. During the bench conference, defense counsel said, "I still don't know [whether to] pass [for] cause based on that answer." Ultimately, defense counsel said, "I guess I still just want to put on the record a challenge for cause to the Court." After acknowledging that the challenge was "on the record," the district court seated B.S. on the jury.[2] Defense counsel's hesitant challenge and the district court's limited response to the challenge suggests that B.S.'s demeanor in responding to the prosecutor's question about mental illness did not express a view of Munt's mental illness

defense that was either strongly or deeply held or was otherwise immovable.

Munt relies on three of our recent cases, in which actual bias in favor of police-officer testimony was at issue, to argue that B.S. expressed actual bias. *See State v. Nissalke,* 801 N.W.2d 82, 107 (Minn. 2011) (involving a prospective juror writing in the questionnaire that he " 'would favor the testimony of a police officer over a non-police officer' " and " 'give the cops a lot of leeway' "); *State v. Prtine,* 784 N.W.2d 303, 309 (Minn.2010) (involving a prospective juror indicating that she knew various law enforcement personnel and stated: " 'I guess to be honest, I would be more inclined to believe [police officers]' "); *State v. Logan,* 535 N.W.2d 320, 322–23 (Minn.1995)(involving a prospective juror answering that it would be " 'virtually impossible for [him] to conclude as a juror that a police officer had testified falsely in [the] case' "). But in those cases, the issue was not demonstrated bias. Instead, actual bias was admitted, and the question was whether the juror was rehabilitated. Here, the question is whether the witness expressed actual bias, an issue not decided in *Nissalke, Prtine,* and *Logan.*

In summary, Munt has failed to carry his burden of proving that B.S. expressed actual bias that would preclude her from setting aside her opinion and trying the case impartially. The district court was in the best position to evaluate B.S.'s credibility and assess whether she expressed actual bias. Based on B.S.'s answer, both in

---

**2.** Munt contends that the district court never actually considered his motion to remove B.S. for cause. It is true that both Munt's motion and the district court's ruling are imprecise and unclear. Specifically, defense counsel challenged B.S. for cause in response to her answer to the question regarding mental illness, but counsel did not explicitly argue B.S. expressed actual bias or describe the actual basis for the challenge. Similarly, the district

court did not explicitly grant or deny the motion; instead, the court simply acknowledged that the challenge was "on the record." No effort was made to rehabilitate B.S. But the logical effect of making "the record" and seating B.S. on the jury is that the district court implicitly denied the motion. On the record before us, we conclude that the district court considered and then rejected Munt's motion to remove B.S. for cause.

itself and considered in context, the district court determined that B.S. did not express actual bias and could render an impartial verdict. Because the record supports that determination, we defer to the district court's decision. *See Skilling*, 130 S.Ct. at 2918 (stating that "[r]eviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality"). Accordingly, we conclude that the district court did not abuse its discretion when it declined to remove prospective juror B.S. for cause.

## II.

■ Munt next argues that comments made by the judge to the jury regarding the upcoming schedule of phase two of the trial constitute reversible error for two reasons. First, the judge's comments constitute structural error because they demonstrated that the judge was actually biased. Second, the judge's comments constitute prejudicial error because they influenced the jury's verdict. We consider each argument in turn.

Munt first contends that the judge's scheduling comments establish that the judge considered Munt guilty before the jury deliberated on the issue at the conclusion of phase one. Based on that contention, Munt asserts that the judge's actual bias deprived him of his right to a fair trial before an impartial judge and constituted

structural error that requires automatic reversal and a new trial. Because we conclude that the judge's comments do not demonstrate actual bias, we need not, and do not, decide whether the alleged bias constitutes structural error.[3]

■ When reviewing a claim that a judge was partial against the defendant, we presume the judge "discharged his or her judicial duties properly." *McKenzie v. State*, 583 N.W.2d 744, 747 (Minn.1998)(citing *Bracy v. Gramley*, 520 U.S. 899, 905, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997)). An impartial judge has "'no actual bias against the defendant or interest in the outcome of his particular case.'" *Id.* at 747 (quoting *Bracy*, 520 U.S. at 905, 117 S.Ct. 1793). To remain impartial, the judge "should avoid the appearance of impropriety and should act to assure that parties have no reason to think their case is not being fairly judged." *Pederson v. State*, 649 N.W.2d 161, 164–65 (Minn.2002). Recent cases have not changed that focus. *See State v. Pratt*, 813 N.W.2d 868, 875–79 (Minn.2012)(involving a retired judge retained by the prosecution as an expert in an unrelated civil case who presided over a criminal defendant's trial prosecuted by the same prosecuting authority); *State v. Schlienz*, 774 N.W.2d 361, 366–69 (Minn.2009)(involving a trial judge engaged in ex parte communication with the prosecutor, during which the judge told

---

3. Previously, we have limited the remedy of structural error to impartial-judge claims in which the defendant established actual bias of the judge as the *trier of fact*. *See State v. Dorsey*, 701 N.W.2d 238, 253 (Minn.2005) (specifying that due process entitles a criminal defendant to the right of a fair trial before an impartial trier of fact). Indeed, we have explicitly declined to resolve whether structural error applies when the judge is not the fact-finder. *See State v. Pratt*, 813 N.W.2d 868, 878 n. 9 (Minn.2012)(declining to reach the issue of whether the trial judge's failure to recuse himself when his impartiality was sub-

ject to reasonable question should be analyzed for structural error or under the three-part *Liljeberg* test); *State v. Schlienz*, 774 N.W.2d 361, 365 (Minn.2009) (declining to reach the issue of whether the presence of an impartial judge should be analyzed for structural error or plain error because the alleged error satisfied the stricter plain error standard); *Powell v. Anderson*, 660 N.W.2d 107, 120–21 (Minn.2003)(applying the three-part *Liljeberg* test to consider an appellate judge's failure to recuse himself when his impartiality was subject to reasonable question).

the prosecutor to be prepared to respond to an anticipated plea-withdrawal motion and suggested specific opposing arguments); *State v. Dorsey*, 701 N.W.2d 238, 250–52 (Minn.2005) (involving a judge, who acted as finder-of-fact in the bench trial, questioned the veracity of a factual assertion made by a defense witness, independently investigated that fact, and announced the results of that investigation to counsel in open court); *Powell v. Anderson*, 660 N.W.2d 107, 113–19 (Minn.2003)(involving a court of appeals judge on the panel who maintained a concurrent attorney-client relationship with the law firm that represented one of the parties to the appeal).

Munt points to two comments the judge made to the jury as evidencing partiality. First, prior to closing arguments in phase one, the judge informed the jury about the future scheduling of the trial:

> Then what will happen is—um—we will take Friday off and Monday we will be back for the second phase of this trial which would only last a day; the reason we are doing this is to coordinate with doctor's schedules; there are two doctors who are suppose[d] to testify [and] are not available until Monday and we had three weeks set aside; I just want to tell you all this stuff[,] I am trying to be respectful of your time, that ... is what is happening now, so that is where we are at. So I will excuse you today and ask that you return tomorrow ready to go at 8:30 with the anticipation that you will get the case for deliberations for the first part of this case late tomorrow morning or early afternoon.

Additionally, after closing arguments and instructions to the jury in phase one, the judge dismissed the two alternate jurors, stating: "I thank you very much for your service; you don't need to come back for the second phase." Thereafter, the jury retired to deliberate and reach a verdict for phase one of the trial.

We conclude that the judge's scheduling comments do not overcome the presumption that the judge discharged his duties properly. We reached a similar conclusion in *McKenzie*, 583 N.W.2d at 747. In *McKenzie*, the defendant challenged a trial judge's decision to empanel an anonymous jury, arguing that the judge was actually biased against him. *Id.* Specifically, the defendant claimed the judge "was predetermined ... to rule for the state-favored position [of] anonymity" as evidenced by the judge's attendance at a judicial meeting where the need to order an anonymous jury in the defendant's case was discussed. *Id.* After reviewing the totality of the circumstances, we .concluded that the allegations of bias were inadequate to overcome the presumption that the judge discharged his duties properly. *Id.* We emphasized that the judge's attendance at the judicial meeting and his subsequent decision to empanel an anonymous jury failed to establish a lack of impartiality, especially when the judge expressly stated at the hearing on the State's anonymous-jury motion that he "ha[d] not made up [his] mind on th[e] issue." *Id.*

Like *McKenzie*, the judge's scheduling comments in this case do not reflect either actual bias or the appearance of impropriety against Munt. Instead, the comments simply informed the jurors of the trial schedule so that they could plan their personal lives. Specifically, the judge's first comment—that the jury would be back for phase two of the trial the following week—was made to inform the jury of the schedule for phase two to assist the jurors in planning their personal schedules. The judge's second comment—that the excused alternate jurors need not return for phase two—was also made to inform the alternate jurors that they were now excused for

the remainder of the trial, however long the trial would last. The judge did not express a belief in either comment that a guilty verdict was a formality in phase one, or that phase two was inevitable.[4]

Munt also contends that the judge's scheduling comments influenced the jury's verdict because they "amounted to a definite statement by the court of its conviction that [Munt] was guilty," and therefore his case is indistinguishable from *State v. Mancino*, 257 Minn. 580, 102 N.W.2d 504 (1960). Based on that contention, Munt asserts that the judge's comments constitute prejudicial error.

In *Mancino*, the defendant was convicted of first-degree grand larceny for stealing merchandise from a department store's warehouse, and was suspected of having an accomplice. *Id.* at 581–83, 102 N.W.2d at 506. During direct examination, the judge remarked in the presence of the jury: " 'And your man was in with him,' " referencing that one of the witnesses admitted to unlawfully removing part of the stolen merchandise from the warehouse from which it was alleged to have been stolen. *Id.* at 591, 102 N.W.2d at 511. Because the judge's objected-to comment reflected a "definite statement by the court of its conviction that defendant was guilty," we concluded that the comment was prejudicial since it "undoubtedly influence[d]" the verdict. *Id.*, 102 N.W.2d at 511–12.

We conclude that the judge's scheduling comments in this case did not improperly influence the jury's verdict. Unlike the defendant in *Mancino*, Munt did not object to the judge's comments. Moreover, the judge's comments lack any "definite

statement" of a conviction that a guilty verdict was preordained. Additionally, any possible prejudice resulting from the comments was negated by the judge's subsequent jury instructions. The judge instructed the jury that he did "not by these instructions, nor by any ruling or expression during the trial, intend[ ] to indicate [an] opinion regarding the facts or the outcome of this case. If I have said or done anything [that] would seem to indicate such an opinion, you are to disregard it." The judge also instructed the jury that Munt was presumed innocent until the State proved him guilty beyond a reasonable doubt. We must presume that the jurors followed those instructions. *See State v. Pendleton*, 706 N.W.2d 500, 509 (Minn.2005).

In sum, we conclude that the judge's comments to the jury about the schedule of phase two of the trial did not express actual or apparent bias against Munt, nor did they improperly influence the jury's verdict. Therefore, the judge's comments do not constitute reversible error.

### III.

 Munt also argues that the district court erred when it denied his request to reappear as a surrebuttal witness to explain why he had his children's car seats in his car on the day of Svetlana's death. Munt argues that this error deprived him of his right to present a complete defense. We review the district court's decision to admit or exclude rebuttal evidence for an abuse of discretion. *State v. Swaney*, 787 N.W.2d 541, 562–63 (Minn.2010).

---

**4.** Munt's reliance on *Pratt, Schlienz, Dorsey,* and *Powell* is misplaced. All four cases are factually distinguishable. The judge in this case did not maintain a disqualifying relationship with the attorneys for one of the parties like the judges in *Pratt* and *Powell*, act as the finder of fact as did the judge in *Dorsey*, or engage in ex parte communication like the judge in *Schlienz*.

 Due process requires that every criminal defendant be " 'afforded a meaningful opportunity to present a complete defense.' " *State v. Richards*, 495 N.W.2d 187, 191 (Minn.1992)(quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). The defendant has the right "to present the defendant's version of the facts through the testimony of witnesses." *State v. Richardson*, 670 N.W.2d 267, 277 (Minn. 2003). Both the defendant and the State, however, must comply with procedural and evidentiary rules designed to ensure " 'both fairness and reliability in the ascertainment of guilt and innocence.' " *Richards*, 495 N.W.2d at 195 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)).

 Minnesota Rule of Criminal Procedure 26.03, subd. 12(g), provides that "the defense may rebut the prosecutor's evidence." Rebuttal evidence is that which "explains, contradicts, or refutes the defendant's evidence." *Swaney*, 787 N.W.2d at 563 (citations omitted)(internal quotation marks omitted). When the district court excludes evidence, an offer of proof provides the evidentiary basis for the court's decision. *Santiago v. State*, 644 N.W.2d 425, 442 (Minn.2002). If we determine that the district court abused its discretion by excluding certain evidence, and that error deprived the defendant of a constitutional right, we then review whether that exclusion of evidence was harmless beyond a reasonable doubt. *Richardson*, 670 N.W.2d at 277. Under that analysis we "must be satisfied beyond a reasonable doubt that if the evidence had been admitted and the damaging potential of the evidence fully realized, an average jury (*i.e.*, a reasonable jury) would have reached the same verdict." *State v. Post*, 512 N.W.2d 99, 102 (Minn.1994). But if "there is a reasonable possibility that the verdict might have been different if the evidence had been admitted, then the erroneous exclusion of the evidence is prejudicial." *Id.; see also Richardson*, 670 N.W.2d at 277.

During its case-in-chief, the State did not present evidence that Munt had child car seats in his vehicle on the day of Svetlana's death. Munt testified that he did not plan or intend to kill Svetlana, but did not testify about the car seats on direct examination. On rebuttal, the State called Bureau of Criminal Apprehension Special Agent Michael Anderson to introduce photographs the police took of the interior of Munt's Suburban showing the car seats to prove that Munt planned to kill Svetlana and drive away with the children. On surrebuttal, defense counsel sought to recall Munt as a witness to explain why he had the car seats in his vehicle. The State's objection was sustained and defense counsel made an offer of proof, stating that Munt would testify he kept the car seats in his car because taking them out would admit that he lost his children forever.

Munt contends that the proffered surrebuttal testimony would have rebutted the State's contention that, because Munt had the car seats in his vehicle on the day of the Svetlana's death, the murder and kidnapping were premeditated. Assuming without deciding that the district court erred by excluding Munt's proffered surrebuttal testimony, we examine whether the alleged error was harmless beyond a reasonable doubt. *See Richardson*, 670 N.W.2d at 279 (concluding that the erroneous exclusion of character evidence was harmless beyond a reasonable doubt because other evidence of premeditation was "overwhelming").

We examine three categories of evidence regarding premeditation: the nature of the killing, motive, and planning activity. *State v. Ortega*, 813 N.W.2d 86, 100 (Minn.

2012). When analyzing the nature of the killing, we consider "facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design." *State v. Moore,* 481 N.W.2d 355, 361 (Minn.1992) (citation omitted) (internal quotation marks omitted). We look to the "number of wounds inflicted, infliction of wounds to vital areas ... passage of time between infliction of wounds, and a defendant's concern with escape rather than with rendering aid to the victim." *State v. McArthur,* 730 N.W.2d 44, 50 (Minn.2007). Here, the State offered evidence that Munt pinned Svetlana's car against the tree to prevent her from escaping, shot Svetlana repeatedly in the head, did not seek medical assistance for Svetlana after shooting her, and then kidnapped the three children and fled the scene in a stolen vehicle.

■■■ We have concluded that motive evidence is unnecessary to a finding of premeditation, but "it can help strengthen a finding that the defendant deliberated about the killing." *State v. Anderson,* 789 N.W.2d 227, 242 (Minn.2010). Motive evidence consists of "prior threats by the defendant to do violence to the victim, plans or desires of the defendant which would be facilitated by the death of the victim, and prior conduct of the victim known to have angered the defendant." *Moore,* 481 N.W.2d at 361 (citation omitted) (internal quotation marks omitted). Motive evidence also includes "evidence that defendant's relationship with the victim had deteriorated and that defendant was angry with [the victim]." *State v. Lodermeier,* 539 N.W.2d 396, 398 (Minn. 1995). Here, the evidence demonstrated that Munt abused Svetlana during their marriage and threatened to injure her, and that the couple's relationship had deteriorated.

■■■ Planning activity consists of "facts about how and what the defendant did prior to the actual killing which showed he was engaged in activity directed toward the killing." *State v. Hughes,* 749 N.W.2d 307, 313 (Minn.2008) (citation omitted) (internal quotation marks omitted). Planning activity may include "prior possession of the murder weapon, surreptitious approach of the victim, or taking the prospective victim to a place where others are unlikely to intrude." *Moore,* 481 N.W.2d at 361 (citation omitted) (internal quotation marks omitted); *see also State v. Voorhees,* 596 N.W.2d 241, 253 (Minn.1999)(finding premeditation when the defendant followed the victim to a place where he knew she would be alone before shooting her). Here, the State presented planning evidence that Munt brought the murder weapon, extra ammunition, and three knives with him the day he shot Svetlana, that Munt had the car seats in the car, and that Munt went to the park where he knew the children would be waiting before the scheduled visitation.

If Munt's surrebuttal testimony had been admitted and the damaging potential of the testimony fully realized, the surrebuttal testimony would only have rebutted the car seat evidence, which played a small part in the State's premeditation argument. The State only mentioned the car seats once in closing argument. Based upon the State's overwhelming evidence of premeditation, we are satisfied beyond a reasonable doubt that the jury would have reached the same verdict. Consequently, we conclude that the allegedly erroneous denial of Munt's request to reappear as a surrebuttal witness was harmless.

IV.

■■■ Munt further argues that the district court erred when it determined

that his 9–year–old daughter J.L.M. was not competent to testify at trial. Munt argues that this error deprived him of his right to present a complete defense. We review the district court's determination as to the competency of a child to testify for an abuse of discretion. *State v. Cermak*, 350 N.W.2d 328, 332 (Minn.1984).

A criminal defendant's right to present a complete defense includes the right to call and examine witnesses. *State v. Reese*, 692 N.W.2d 736, 740 (Minn.2005)(citing *Chambers*, 410 U.S. at 294, 93 S.Ct. 1038). But the defendant must "still comply with established rules of evidence designed to assure both fairness and reliability in assessing guilt or innocence." *Id.* One such rule is that "the competency of a witness to give testimony shall be determined in accordance with law." Minn. R. Evid. 601.

Minnesota Statutes § 595.02, subd. 1 (2012), provides standards governing when particular witnesses are competent to testify. A child younger than 10 years old is presumed competent to testify "unless the court finds that the child lacks the capacity to remember or to relate truthfully facts respecting which the child is examined." *Id.*, subd. 1(n). To determine whether the child is competent to testify, the district court must "test whether the child has the ability to relate events truthfully." *State v. Scott*, 501 N.W.2d 608, 613 (Minn.1993)(citing *State v. Lanam*, 459 N.W.2d 656, 659–60 (Minn. 1990)). The district court must assess the child's ability to remember and relate facts generally, rather than ask about the specifics of any anticipated testimony. *Id.* at 615.

The district court held a pretrial hearing to assess the competency of all three children to testify at trial. The district court first interviewed the two boys, M.M.M. and M.L.M., and determined that M.L.M. was competent to testify but that M.M.M. was not. J.L.M., however, refused to enter the courtroom. The district court made extensive findings describing what occurred. Initially, 9–year–old J.L.M. refused to leave the home of her foster parents. J.L.M. eventually allowed a social worker to drive her to the courthouse but told the social worker she was afraid of her father, men, and specifically the male judge. Once the vehicle arrived at the courthouse, it took the combined efforts of two social workers and a guardian ad litem to convince J.L.M. to enter the building. Thereafter, the district court sought to interview J.L.M., but she refused to enter the courtroom for the competency hearing. The mental health worker told J.L.M. "it is your turn to go and talk to the judge now" and J.L.M. said, "[N]ope I am not going." The mental health worker again asked J.L.M. "if the judge could come into the room and talk to her" and J.L.M. responded, "[N]o I am not talking to the judge."

The district court concluded that J.L.M. was incompetent to testify at trial. The court stated:

> J.L.M. is a significantly traumatized little girl and by refusing to leave her home, leave the vehicle, and speak with the judge during the competency hearing; she certainly made her own case that she is not competent to testify at trial. Because the Court was not able to assess J.L.M.'s ability to relate events truthfully; the Court must find J.L.M. incompetent to testify at trial.

Munt contends that the district court erred because it never examined J.L.M.'s competency at the hearing, and her refusal to enter the courtroom had no relevancy to her ability to relate facts truthfully to the jury. We agree that a witness's refusal to appear in court does not by itself render a witness incompetent to testify. But

586

Munt's argument fails to recognize that J.L.M.'s refusal to appear in court was the result of significant trauma and fear which affected her capacity to relate *any* facts at trial. The district court considered J.L.M.'s conduct and its findings are amply supported by the record. Based on its findings in this case, the district court could reasonably conclude that the fear and trauma that rendered J.L.M. incapable of entering the courtroom also rendered her incapable of relating any facts at trial regarding her mother's murder. Thus, the district court did not abuse its discretion when it determined that J.L.M. was not competent to testify at trial.

### V.

Munt next argues that the district court erred when it failed to inquire into the nature of his pretrial complaints regarding the effectiveness of appointed counsel. Munt requests a remand for an evidentiary hearing to determine whether his complaints warranted the appointment of substitute counsel. We review the district court's decision to appoint substitute defense counsel for an abuse of discretion. *See State v. Clark,* 722 N.W.2d 460, 464–65 (Minn.2006).

The United States and Minnesota Constitutions guarantee a criminal defendant the right to the assistance of counsel for his defense. U.S. Const. amend VI; Minn. Const., art. I, § 6. If the defendant cannot employ counsel, the defendant is entitled to appointed counsel. *Gideon v. Wainwright,* 372 U.S. 335, 339–45, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). But the right of an indigent defendant to court-appointed defense counsel is not an "unbridled right to be represented by counsel of [the defendant's] choosing." *State v. Fagerstrom,* 286 Minn. 295, 299, 176 N.W.2d 261, 264 (1970).

When a defendant raises complaints about the effectiveness of appointed counsel's representation and requests substitute counsel, the district court must grant such a request "only if exceptional circumstances exist and the demand is timely and reasonably made." *State v. Worthy,* 583 N.W.2d 270, 278 (Minn.1998) (citation omitted) (internal quotation marks omitted). Exceptional circumstances are those that affect appointed counsel's "ability or competence to represent the client." *State v. Gillam,* 629 N.W.2d 440, 449 (Minn.2001). But a defendant's general "dissatisfaction" with appointed counsel does not amount to an exceptional circumstance. *Id.* (citing *Fagerstrom,* 286 Minn. at 299–300, 176 N.W.2d at 265). When the defendant "voices serious allegations of inadequate representation," the district court should conduct a "searching inquiry" before determining whether the defendant's complaints warrant the appointment of substitute counsel. *Clark,* 722 N.W.2d at 464.

Here, the event that precipitated Munt's complaint occurred at a pretrial hearing to consider the State's motion to permit a detective to testify about an email without calling a foundation witness. Defense counsel objected to the State's motion, and Munt made his own objection, claiming that the detective "performed crimes against both [him] and [his] children." The district court indicated it would permit Munt to make a brief statement but that he should otherwise raise legal issues with his attorneys. Munt responded: "I—I brought it up and my attorney[ ]s didn't represent my interest and they are not following the code of conduct that requires them to be pursuing my objectives in the matter." The district court reminded Munt to speak through his attorneys and warned him that it would have to remove him from the courtroom if he was unable to remain silent. Munt replied: "[H]ow

does that relate to—to a mistrial or beginning of a whole new process based on—um—based on the ineffective counsel?" At that point, defense counsel suggested that the district court permit him to privately confer with Munt off the record. After a short recess, the following exchange occurred between the district court and defense counsel:

> Court: [Counsel] is there anything you wish to bring up to the Court at this particular point in time?
>
> Counsel: No, your Honor. We have spoke[n] with Mr. Munt and we are on track and everything is fine to go.

Munt did not make any subsequent complaints about his defense counsel.

We conclude that Munt has failed to establish exceptional circumstances that would warrant a further inquiry into his complaints or the appointment of substitute counsel. While Munt may have been dissatisfied with his defense counsel, neither of his statements constituted serious allegations of inadequate representation that would have triggered the district court's duty to further inquire and determine whether it needed to appoint substitute counsel. Further, the district court permitted Munt to confer privately with counsel, and after the recess, defense counsel represented to the court that he and Munt were "on track" and "everything is fine to go." Munt's acquiescence in defense counsel's continued representation confirms that the district court did not err by failing to make an additional inquiry into Munt's complaints. *Cf. State v. Pilcher,* 472 N.W.2d 327, 337 (Minn.1991)(holding that the defendant acquiesces when his counsel admits guilt when the defendant was present at the time of the admission and did not object). We therefore conclude that the district court did not abuse its discretion and that

remand for an evidentiary hearing is unwarranted.

## VI.

Additionally, Munt raises various claims in his pro se supplemental brief. First, Munt claims that the State engaged in prosecutorial misconduct warranting a new trial. Essentially, Munt claims that the State referred to facts not supported by evidence in the record. Because defense counsel did not object to any of these statements during trial, we review under a modified plain-error test. *State v. Ramey,* 721 N.W.2d 294, 302 (Minn.2006). Under this test, the defendant must first prove that an error was made and that it was plain. *Id.* An error is plain if it "contravenes case law, a rule, or a standard of conduct." *Id.* We have long held that the State may present "all legitimate arguments on the evidence and all proper inferences that can be drawn from that evidence" in its closing argument. *State v. Pearson,* 775 N.W.2d 155, 163 (Minn.2009). We view the closing argument "as a whole, rather than just selective phrases or remarks that may be taken out of context or given undue prominence to determine whether reversible error has occurred." *State v. McDaniel,* 777 N.W.2d 739, 751 (Minn.2010) (citation omitted)(internal quotation marks omitted).

We conclude that the State's closing argument, as a whole, is well-supported by inferences drawn from evidence in the record, and that none of Munt's claims of prosecutorial misconduct constitute error that warrant further review. Specifically, the State's reference to Munt's "selfishness" is supported by evidence that he caused serious injury to one of his sons, controlled Svetlana, and abused the children. The State's argument that Munt knew Svetlana "more likely than not" would be at Rasmussen Woods park on the

morning of her death is supported by Munt's own testimony that he frequently waited in the Rasmussen Woods park for his scheduled visitations with his children to begin and that he had seen Svetlana in the park on prior occasions. The State's remark that Munt "finally had his opportunity to act" on March 28 notes the fact that Munt did kill Svetlana and kidnap the children that morning. Lastly, the State's remarks that Munt "planned this" and acted in "cold blood" were components of the State's overall case for premeditation.

■ Munt next claims that several jurors were incapable of trying the case impartially, and their seating on the jury deprived him of his right to a fair trial. We conclude that none of the jurors Munt accuses of partiality admitted to actual bias; or alternatively, the jurors were rehabilitated. For example, Munt asserts that juror M.L. should not have been seated because she sold lumber to M.D. 10 to 15 years prior and admitted that she believed Munt shot Svetlana and it would be "tough" for her to set aside that belief. But M.L. also testified during voir dire that nothing about her association with M.D. would prevent her from being fair and impartial. Moreover, M.L. stated that she could set aside what she heard in the media about the case 16 to 18 months earlier, and that she could be fair and impartial and base her decision on evidence admitted and the law as instructed. *See Prtine,* 784 N.W.2d at 310.

■ Munt asserts various other claims, including: (1) the district court erroneously admitted hearsay evidence; (2) witnesses were tampered with; (3) he received ineffective assistance of counsel; (4) he needed more expert witnesses to testify at trial and lacked the trial testimony of other key witnesses, including his children; (5) the judge, court officials, and attorneys had conflicts of interest that indicated cor-

ruption; (6) he suffered gender, economic, and religious discrimination; (7) the district court should have ordered a change of venue due to negative media coverage; (8) his sentence of life imprisonment without the possibility of release constituted cruel and unusual punishment; and (9) the district court violated his children's due process and equal protection rights. But Munt fails to cite any evidence in the record or legal authority that support these claims. *See State v. Sontoya,* 788 N.W.2d 868, 876 (Minn.2010) (declining to address a pro se claim on the merits where the defendant did not cite either the record or legal authority for support); *State v. Bartylla,* 755 N.W.2d 8, 22 (Minn.2008)(noting that "[w]e will not consider pro se claims on appeal that are unsupported by either arguments or citations to legal authority"). We therefore decline to address these claims.

Affirmed.

WRIGHT, Justice (dissenting).

Although I agree with the majority's resolution of most of the issues in this case, I disagree with its conclusion that the district court did not abuse its discretion in declining to remove prospective juror B.S. for cause. B.S. demonstrated actual bias when she expressed a personal belief that was antithetical to Minnesota law on Munt's mental-illness defense, and proper rehabilitation did not occur. Therefore, I respectfully dissent.

I.

A criminal defendant has the right to a fair trial and an impartial jury. U.S. Const. amends. VI, XIV; Minn. Const. art. I, § 6. This right guarantees that the "defendant will have his case decided strictly according to the evidence presented and not by ... the predilections of individual jurors." *State v. Varner,* 643 N.W.2d 298,

304 (Minn.2002). We have stated that "[t]he impartiality of the adjudicator goes to the very integrity of the legal system," and thus "[t]he bias of a single juror violates the defendant's right to a fair trial." *State v. Evans*, 756 N.W.2d 854, 863 (Minn.2008) (quoting *State v. Brown*, 732 N.W.2d 625, 630 (Minn.2007)). Permitting a biased juror to serve is structural error requiring automatic reversal because the error "undermines the basic structural integrity of the criminal tribunal itself." *Holt v. State*, 772 N.W.2d 470, 477 (Minn. 2009) (citation omitted) (internal quotation marks omitted).

In analyzing whether the district court erred by seating a juror, the relevant inquiry is whether the juror had a biased state of mind, in reference to either the case or a party, so as to demonstrate that she "cannot try the case impartially and without prejudice to the substantial rights of the challenging party." Minn. R.Crim. P. 26.02. subd. 5(1); *accord State v. Logan*, 535 N.W.2d 320, 323 (Minn.1995). When a juror expresses such a state of mind, the district court *must* excuse the juror for cause unless she is rehabilitated. *State v. Prtine*, 784 N.W.2d 303, 310 (Minn.2010). Rehabilitation requires the district court, by instructions and additional questions, to convince the juror to relinquish the biased state of mind, promise that she will follow the district court's instructions, set aside any preconceived notions, and fairly evaluate the evidence. *State v. Nissalke*, 801 N.W.2d 82, 107 (Minn.2011). For rehabilitation to be effective, the juror must *unequivocally* state that she will be impartial; it is not enough for her to merely state that she will "try." *Logan*, 535 N.W.2d at 323; *Prtine*, 784 N.W.2d at 310–11.

### A.

The majority concedes that no effort was made to rehabilitate B.S. after Munt challenged her for cause on the ground that she was biased against his mental-illness defense. Therefore, the only question is whether B.S. actually had a biased state of mind such that she could not judge the case impartially and without prejudice to Munt's substantial rights. The majority concludes that Munt has failed to establish actual bias. I cannot agree.

Here, the following exchange took place between the prosecutor and B.S. during voir dire:

Q. I just want your opinion; what—in general what do you think if somebody comes into court and says, yeah I did it but I am mentally ill and—you know—I am really not responsible for what I did, what's—what's your thought on that?

A. My personal opinion about it [is] if you confess then you are aware that you did [it], so basically mental illness or not you are [aware] of what you did so you should be held responsible.

The crux of B.S.'s statement is that, "*if you confess*" to committing a criminal act, "then you are aware that you did [it]" and "*mental illness or not . . . you should be held responsible.*" In other words, B.S. unequivocally expressed a belief that the defendant's subsequent confession automatically defeats a defense based on mental illness. This belief cannot be reconciled with Minnesota law. Under Minnesota law, a defendant is not criminally responsible for his acts if he can prove that "at the time of committing the alleged criminal act [he] was laboring under such a defect of reason . . . as not to know the nature of the act, or that it was wrong." Minn.Stat. § 611.026 (2012); *see also State v. Peterson*, 764 N.W.2d 816, 822 (Minn.2009). That a defendant recognizes the wrongfulness of his acts *after the fact*—and even acknowledges it

or confesses to it—is not determinative. Rather, the relevant question is whether the defendant is aware of the wrongfulness of his conduct *"at the time of committing the alleged criminal act."* Minn. Stat. § 611.026 (emphasis added); *see also, e.g., Davis v. State*, 595 N.W.2d 520, 527 (Minn.1999)(holding that the defendant was not so mentally ill at the time he committed the offenses as to be excused for his culpable behavior); *State v. Brom*, 463 N.W.2d 758, 764 (Minn.1990) (observing that a defendant must prove mental illness at the time of the crime).

Because B.S. believed that "if you confess then ... mental illness or not ... you should be held responsible," she demonstrated actual bias against Munt's defense. Munt admitted that he shot and killed Svetlana, but he asserted that he was not guilty by reason of his mental illness. Under B.S.'s belief, Munt "should be held responsible" even though the law provides that Munt should *not* be held criminally responsible *if* he can prove his mental-illness defense. Inherent in the principle of an impartial jury is that the jurors will apply the law impartially to the facts of the defendant's case. A juror who states that she would automatically reject a mental-illness defense *without faithfully applying the law to the defendant's particular circumstances* "has already formed an opinion on the merits," and thus should be struck for cause. *See Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); *see also Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) ("The theory of the law is that a juror who has formed an opinion

cannot be impartial." (quoting *Reynolds v. United States*, 98 U.S. 145, 155, 25 L.Ed. 244 (1878))).

### B.

#### 1.

The majority contends that B.S. did not demonstrate bias toward Munt's mental-illness defense because that defense is governed by the *M'Naghten* standard and there is no evidence that B.S. was aware of the requirements to establish the defense under that standard. In particular, the majority observes that *M'Naghten* limits the availability of the defense to situations where a mental illness causes the defendant "not to know the nature of the act, or that it was wrong." *See* Minn.Stat. § 611.026. But, according to the majority, B.S. might have been using the term "mental illness" more broadly, to encompass any and all emotional, cognitive, or behavioral impairments from which a defendant might suffer. Therefore, the majority reasons, B.S.'s statements do not express bias against Munt's mental-illness defense.

I disagree with the conclusion that the majority draws from this analysis. It is true that B.S., a nonlawyer, did not phrase her answer in a way that mirrored the *M'Naghten* rule, and she may have attached a broad connotation to the term "mental illness." But this interpretation of B.S.'s statement does not render the error that flows from it harmless. The structural error here has nothing to do with what B.S. meant by "mental illness."[1] Rather, the error resides in the

---

1. Even if B.S. did ascribe a broad meaning to "mental illness," and understood it to mean any cognitive, emotional, or behavioral impairment, I fail to see how that fact would support the majority's conclusion. After inserting the majority's "general understanding" of mental illness into B.S.'s statement, it

reads as follows: "if you confess then you are aware that you did [it], so basically [whether you have any cognitive, emotional, or behavioral impairment] or not ... you should be held responsible." The majority's interpretation of B.S.'s statement demonstrates that B.S. believes that *all* mental illnesses—re-

dispositive weight that B.S. would assign to Munt's *confession.* Whether B.S. was using the term "mental illness" more broadly than the *M'Naghten* rule is of no moment. From B.S.'s statement, we know that, regardless of the kind of mental illness involved, B.S. would not consider the mental-illness defense because Munt had confessed to the crime.

The majority also ignores practical realities when it relies on B.S.'s lack of knowledge of the *M'Naghten* rule. A prospective juror who understands during voir dire the substantive legal standards governing such matters as the elements of crimes and affirmative defenses is a rarity. Yet the majority authorizes district courts to ignore evidence of bias from jurors merely because the juror's personal opinion is not precisely phrased to mirror the legal standard. Consider, for example, an intentional murder case in which self-defense is asserted. During voir dire, the prosecutor asks "what do you think if somebody comes into court and says, yeah I did it but I was defending myself and I am really not responsible for what I did." The juror responds, "my personal opinion is that if you confess then self-defense or not you should be held responsible." Applying the rule of law articulated in the majority's opinion, such a statement would not establish actual bias because the juror did not expressly state that her reference to "self-defense" encompassed the *legal* standard for self-defense—proportional force used in response to a reasonable fear of great bodily harm or death that was not provoked by the defendant and for which there was not a reasonable opportunity to retreat. *See State v. Basting,* 572 N.W.2d 281, 285–86 (Minn.1997) (discussing the legal standard for self-defense). Such a rule

jeopardizes a defendant's right to an impartial jury by creating an unrealistic degree of specificity required of a prospective juror's statement to prove actual bias.

Finally, the majority's analytical approach is myopically formulaic, applying dictionary definitions to B.S.'s words while ignoring the context in which the statements were made. The district court and the trial attorneys had advised B.S. that mental illness would be relevant at trial. During the State's voir dire, the prosecutor's question to B.S. mirrored the facts of Munt's case. Like the defendant in the prosecutor's hypothetical, Munt had acknowledged his criminal act by confessing to his fiancée that he had shot and killed Svetlana, and he did not dispute that fact at trial; but he asserted that he was "really not responsible for what [he] did" because of his mental illness. When this hypothetical was presented to B.S. during voir dire, she expressed her personal opinion on an ultimate issue in the case— whether the defendant (Munt) "should be held responsible" on these facts despite his mental illness. B.S. revealed an opinion on the merits of the case based on her individual predilection, not on the evidence and the law. Notwithstanding the district court's analysis of the juror's demeanor that the majority opinion imagines occurred, the majority's conclusion that B.S. did not demonstrate "actual bias" against Munt's defense lacks a foundation in both law and fact. *See Dowd,* 366 U.S. at 722, 81 S.Ct. 1639 (stating that "a juror who has formed an opinion cannot be impartial").

2.

The majority's conclusion that B.S. did not show actual bias also is premised on the belief that there are two reasonable

---

gardless of severity—are irrelevant to whether a defendant should be held responsible. Even under this broad meaning of "mental illness,"

B.S.'s bias against Munt's mental-illness defense remains.

interpretations of her statement: (1) that a confession means that the defendant was aware of what he did *after the fact* and is therefore guilty, or (2) that a confession means that the defendant was aware of what he did *at the time of* the criminal act and is therefore guilty. The majority suggests that Munt's argument succeeds only if the first interpretation is true. But that is patently incorrect. B.S.'s statement shows actual bias under either interpretation. Under the first interpretation, B.S.'s statement is correct insofar as it implies that a confession shows awareness of the wrongfulness of the act *at the time of the confession;* but it is incorrect that the legal consequence of such awareness is guilt. Under the second interpretation, B.S.'s statement suffers from the opposite problem. It correctly states that awareness at the time of the act means that the defendant is guilty, but it incorrectly implies that a later confession *conclusively demonstrates such awareness.*

While I agree that a subsequent confession may be *probative* of the defendant's awareness at the time of the criminal act, B.S.'s statement plainly goes further than that and expresses a categorical belief that *"if* you confess *then* you are aware ... so you should be held responsible." B.S.'s prejudgment is evident because such a categorical and unqualified conclusion cannot properly be drawn without hearing the evidence of Munt's case. In other words, just as bias is demonstrated when a juror says that she would automatically favor the testimony of a police officer, *see Nissalke,* 801 N.W.2d at 107–08, bias is also demonstrated when a juror states that she would automatically equate a defendant's subsequent confession with his awareness of wrongfulness of the conduct at the time of the act. Rather, the juror must fairly and impartially consider the evidence before concluding that a defendant was aware of the wrongfulness of his conduct at the time of the act.

Thus, under both the first and second interpretations of her statement, B.S. unequivocally expressed her belief that Munt's subsequent confession automatically defeated his mental-illness defense. If that were the law in Minnesota, virtually no defendant could assert such a defense. By definition, an affirmative defense is one in which the defendant asks to be found not guilty despite the fact that the defendant admits (or the prosecution proves) the elements of the underlying criminal charge. *See Black's Law Dictionary* 451 (8th ed.2004) (defining "affirmative defense" as the defendant's assertion of facts that will defeat the prosecution's claim "even if all the allegations in the complaint are true"). As such, the mental-illness defense is almost always raised in situations in which the defendant has acknowledged—either in court or outside of it—committing the criminal act. *See, e.g., State v. McLaughlin,* 725 N.W.2d 703, 706–07 (Minn.2007); *State v. Schreiber,* 558 N.W.2d 474, 477 (Minn.1997); *State v. Wilson,* 539 N.W.2d 241, 244 (Minn.1995). By allowing B.S. to serve on the jury, the district court erred regardless of what timeframe B.S. was referring to in her statement. In concluding that the error is harmless, the majority presumes a temporal precision in B.S.'s statement that could only be derived from additional voir dire, which did not occur.

### 3.

Citing a general duty to view B.S.'s voir dire testimony as a whole, the majority also contends that B.S.'s statements regarding the mental-illness defense do not demonstrate actual bias in light of her acknowledgement, in response to the questions from the district court, that (1) she would be able to follow the district court's instructions, and (2) there was no reason

she could not render a fair and impartial verdict in the case. The majority's reliance on these statements is unpersuasive. These statements were made well *before* B.S. was asked specifically about her beliefs with respect to the mental-illness defense. A juror's agreement in the abstract that she can be impartial and follow all of the district court's instructions is of limited value when, at the time the question is asked, the juror does not have any specific knowledge of what the district court's instructions and the issues in the case will be.[2] Indeed, during voir dire questioning by Munt's attorney, B.S. qualified her earlier statement regarding her ability to be impartial. When asked whether she thought she had the qualities to be a good juror, B.S. responded: "I don't know—I really don't know much about this case so therefore *I am pretty impartial as to anything until I learn more about it ....*" When B.S. did "learn more about it" through the prosecutor's voir dire, she expressed a belief that demonstrated an *inability* to be impartial.

4.

Finally, the majority relies heavily on the deference we give to a district court's

determination that a prospective juror did not express actual bias. I agree that we owe deference when we review a district court's ruling on a challenge for cause. But by mischaracterizing the nature and purpose of that deference, the majority effectively immunizes a juror's expression of bias from appellate review. We give great deference to "[a] trial court's *findings* of juror impartiality," which "may be overturned only for manifest error." *Skilling v. United States*, —— U.S. ——, 130 S.Ct. 2896, 2923, 177 L.Ed.2d 619 (2010) (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 428, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991)) (emphasis added). If the district court had made a finding of impartiality in this case, deference might justify the majority's decision today. But the district court did not. Likewise, this record is devoid of any indication that the district court relied on B.S.'s "demeanor" or made a "credibility determination." Rather, in summarily denying Munt's challenge for cause, the only rationale that the district court gave was that "[w]e are not going backwards." No "finding" of impartiality, express or implied, can be discerned from

---

**2.** In effect, the majority is compensating for the lack of rehabilitation in this case by importing testimony made before the biased statement to cure the error. One might cleverly coin the phrase "prehabilitation" to refer to this phenomenon. The only legal support the majority cites for its proposition comes from an intermediate appellate court from another jurisdiction. *See People v. Willard*, 226 A.D.2d 1014, 641 N.Y.S.2d 896 (1996). But *Willard* is plainly inapposite. In *Willard*, a prospective juror stated that he worked in the prison system but promised that his occupation would not prevent him from being impartial, and that he would render a decision based upon the evidence presented. *Id.* at 900. But he also wore a t-shirt stating "Support Your Local Corrections Officers. Reinstate Capital Punishment" and admitted that he wore the shirt because he was "irritated" about getting called for jury duty. *Id.* He

then stated that he understood the present case had nothing to do with the death penalty and concluded that he was "sorry" he wore the shirt because "I don't want you to think that I can't reach a reasonable conclusion and weigh evidence." *Id.* The defendants challenged the juror for cause, which was denied. *Id.* The appellate court affirmed, holding that neither the juror's "annoyance at being called for jury duty," nor his "political beliefs regarding the death penalty, created a state of mind which would preclude him from being an impartial juror" in a case in which the death penalty was *not* at issue. *Id.* Unlike the circumstances here, the juror in *Willard* did not make a biased statement on the central issue in the criminal case and, in any case, stated that he could be impartial both before and *after* he made the allegedly biased statements.

the statement that "[w]e are not going backwards." It is, in essence, merely a procedural ruling or scheduling order. And because the district court did not make a finding of impartiality, or rely on B.S.'s demeanor or credibility, the majority errs when it affords a level of deference that effectively overrides the plainly-biased meaning of the juror's statement.

## II.

If a juror expresses a belief demonstrating an inability to be impartial, then the juror must be excused unless she is rehabilitated. *Logan,* 535 N.W.2d at 323. A juror may be rehabilitated if she states unequivocally that "she will follow the district court's instructions and will set aside any preconceived notions and fairly evaluate the evidence." *Nissalke,* 801 N.W.2d at 107 (quoting *Prtine,* 784 N.W.2d at 310). But, as the majority concedes, B.S. was not rehabilitated. After Munt passed B.S. for cause, the prosecutor's very first question elicited the biased statement at issue here. The prosecutor did not ask any follow-up questions and, even after Munt's attorney objected and asked to record a challenge for cause, the district court did not inquire into the matter with B.S. Rather, the district court stated, "[w]e are not going backwards" and summarily denied Munt's challenge for cause.

Without the district court performing the work necessary to ascertain anything other than the plain meaning of B.S.'s statements, the plain meaning stands. And the plain meaning establishes that B.S. prejudged and rejected Munt's mental-illness defense. *See Hughes v. United States,* 258 F.3d 453, 459 (6th Cir.2001) ("[B]ecause [the juror's] declaration was not followed by any attempt at clarification or rehabilitation, there is no ambiguity in the record as to her bias; [the juror's] express admission is the only evidence available to review."); *see also United States v. Nell,* 526 F.2d 1223, 1229 (5th Cir.1976) (stating that a district court "has the duty to develop the facts fully enough so that it can make an informed judgment on the question of 'actual' bias"). As a result, a juror with a personal belief directly contrary to Minnesota law governing Munt's mental-illness defense served on the jury and decided the case. Minnesota law demands a fair trial and an impartial jury regardless of the severity of the crime charged or "the apparent guilt of the offender." *Irvin,* 366 U.S. at 722, 81 S.Ct. 1639. "Permitting a biased juror to serve undermines the basic structural integrity of the criminal tribunal itself." *Holt,* 772 N.W.2d at 477 (citation omitted) (internal quotation marks omitted). With this basic legal tenet as my guide, I would reverse and remand for a new trial on the issue of Munt's mental-illness defense.

PAGE, Justice (dissenting).

I join in the dissent of Justice Wright.

ANDERSON, PAUL H., Justice (dissenting).

I join in the dissent of Justice Wright.