STATE OF MINNESOTA

IN SUPREME COURT

A24-0952

Ramsey County                                                                  Thissen, J.

State of Minnesota,

          Respondent,

vs.                                                                            Filed: April 1, 2026
                                                                               Office of Appellate Courts
Shawn Michael Tillman,

          Appellant.

_____

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Alexandra Meyer, Assistant Ramsey County Attorney, Saint Paul, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Julie Loftus Nelson, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.     The district court conducted a "searching inquiry" into the allegations underlying the defendant's request for substitute counsel when the district court's inquiry, combined with its knowledge of the record, provided sufficient information to allow the district court to determine the truth and scope of the defendant's allegations and whether

1

the allegations presented exceptional circumstances calling into question the attorney's ability and competence to represent the defendant.

2.     The district court did not err when it determined that the defendant's waiver of counsel was constitutionally valid.

3.     The claims raised in appellant's pro se supplemental brief lack merit.

Affirmed.

O P I N I O N

THISSEN, Justice.

A jury found appellant Shawn Michael Tillman guilty of first-degree premeditated murder, Minn. Stat. § 609.185(a)(1); second-degree intentional murder, Minn. Stat. § 609.19, subd. 1(1); and ineligible possession of a firearm, Minn. Stat. § 624.713, subd. 1(2). The district court convicted Tillman and sentenced him to life imprisonment without the possibility of release on the first-degree premeditated murder charge.

In this direct appeal, Tillman argues that the district court abused its discretion when it denied his request for substitute appointed counsel. Tillman claims that the district court did not conduct a "searching inquiry" sufficient to determine whether exceptional circumstances—circumstances affecting appointed counsel's ability or competence to represent Tillman—existed. Tillman further claims that the district court abused its discretion when it accepted Tillman's waiver of the right to counsel. Tillman raises multiple other claims in a pro se supplemental brief.

We conclude that the district court did not abuse its discretion when it denied Tillman's request for substitute counsel, that Tillman validly waived his right to counsel, and that his pro se claims lack merit. Accordingly, we affirm Tillman's convictions.

**FACTS**

In May 2022, Tillman shot and killed Demetri Ellis-Strong at a light-rail station in St. Paul. A video from Metro Transit surveillance cameras shows Ellis-Strong standing on the station's south platform. Tillman and another individual walked onto the north platform. Tillman and Ellis-Strong appeared to converse across the tracks and the exchange became heated. Tillman walked toward the end of the north platform and Ellis-Strong followed on the south platform. Ellis-Strong shouted as Tillman exited his platform and briefly walked away from the station and out of view of the camera. Tillman reentered the camera's view several seconds later and started walking across the tracks toward the south platform. Tillman stopped at the entrance to the south platform, drew a handgun, and spent approximately 22 seconds loading the gun and putting on a glove. Ellis-Strong appeared to notice Tillman was armed and took several steps backward. Tillman walked onto the platform, raised his handgun, and shot Ellis-Strong. Ellis-Strong fell to the ground and Tillman fired several more rounds. Tillman came closer, stood over Ellis-Strong, and shot Ellis-Strong three times at close range. Tillman then jogged off the platform and away from the station. Ellis-Strong died from his wounds. The police arrested Tillman. The State charged him with second-degree intentional murder and a grand jury subsequently indicted Tillman for first-degree murder and ineligible possession of a firearm.

3

At a pretrial hearing in July 2022, Tillman alleged that he and his appointed public defender, E.K., had a conflict of interest, and he requested that the district court appoint substitute counsel. The district court informed Tillman that it needed to conduct a "searching inquiry" before granting a request for substitute counsel and asked Tillman to explain the conflict. Tillman replied that he and E.K. "got on a personal note," and that they had "history." The district court asked Tillman to elaborate, but Tillman declined, stating he would not "get into . . . detail[s] about the situation." E.K. stated that she previously represented Tillman but unequivocally denied that they had a personal relationship. The district court found that Tillman failed to show he was entitled to substitute counsel and denied his request. Subsequently, Tillman asked the district court to discharge E.K. and grant him a continuance to seek private counsel, which the district court allowed.

Tillman hired a private attorney, A.K., in August 2022. At A.K.'s request, the district court ordered a competency and mental-illness-defense evaluation of Tillman under Minnesota Rules of Criminal Procedure 20.01 and 20.02. The evaluator reported that Tillman refused to meet her. The evaluator then drafted a competency report relying on Tillman's available records. The evaluator found that Tillman "d[id] not demonstrate impairments in his abilities to consult with his attorney, participate in his defense, or factually understand proceedings as a result of mental illness." The evaluator did not "identify any impairments to Mr. Tillman's adjudicative capabilities" and found no reason to conclude he was incompetent. The State asserted that the evaluator's report was

4

sufficient and Tillman did not object. Relying on the evaluation, the district court found Tillman competent to stand trial.

After Tillman was found competent to stand trial, A.K. asked to withdraw from representation, and the district court granted his request. Following that withdrawal, the public defender's office appointed a conflict attorney, S.G., to represent Tillman. S.G. appeared with Tillman at a February hearing and Tillman did not object.

At his next hearing, in May 2023, Tillman alleged that he had a conflict of interest with the public defender's office and requested that the district court discharge S.G. and appoint substitute counsel. The district court asked Tillman to elaborate. Tillman explained that he had a conflict with S.G. because he had a conflict with "all the public defenders in the public defender's office." The district court reminded Tillman that S.G. was "not a full-time Ramsey County Public Defender," and was "outside conflict counsel specially appointed for [Tillman's] case." Tillman did not give reasons why he believed that S.G. specifically had a conflict of interest. The district court concluded its inquiry and denied Tillman's request for substitute counsel.

Prior to a September 2023 hearing, Tillman submitted an ex parte motion asserting that S.G. had acted unethically by violating the attorney-client privilege. To support that allegation, Tillman attached affidavits from two fellow inmates. One inmate's affidavit asserted that he heard a detention center guard tell a nurse that she had "contact" with S.G. and heard the guard "talking openly about [Tillman's] case." The inmate also averred that the guard opined that it was "dumb" for Tillman to take a first-degree murder case to trial. The other inmate made similar, but less detailed, assertions in his affidavit. The district

court administrator received the ex parte motion and affidavits on September 11, with a supplement on September 12. It is not clear when the district court judge received those documents.

At a hearing on September 14, 2023, Tillman again requested substitute counsel. The district court repeatedly asked Tillman to explain the reasons he needed a new attorney. Tillman reasserted his claim that S.G. had a conflict of interest. Tillman also asserted that S.G. had engaged in "unethical practices" and referred to his "recently filed affidavits," but Tillman failed to explain what was in the affidavits or otherwise explain his allegation. In response to questions about his concerns with S.G.'s representation, Tillman accused the district court of bias and challenged its jurisdiction. The exchange between Tillman and the district court included the following:

> DEFENDANT: [I] . . . filed a motion for [S.G.] to get a waiver from the Court and government to be able to properly represent me—be properly representing me being an officer of the court. *Brady vs. Maryland* and *Jencks vs. United States*; or the alternative to appoint outside counsel for the conflict of interest for recent filed affidavits on his unethical practices as well.

> DISTRICT COURT: [L]et's talk about that, Mr. Tillman. So help me understand exactly what you're asking for today, sir.

> DEFENDANT: [I have] also, you know, motion for full disclosure of discovery, which [I] still [have] not received to this day. [I am] present right now and is the Court going to rule on these motions as well or should [I] have to file for writ of mandamus to the appellate courts?

> DISTRICT COURT: I've told you before, Mr. Tillman, I can't rule on motions that you filed as a self-represented litigant while you have counsel . . . . But what I do want to understand . . . before we go much further, is what you're—let's talk just about your representation, sir. And I want to make sure I understand exactly what you're asking for. Can you talk me through that for me?

6

DEFENDANT:      Do you have a claim against me, Your Honor?

DISTRICT COURT:      No. I do not have a claim against you, Mr. Tillman.

. . .

DEFENDANT:      So if you don't have no claim against me, then the court is improperly set.

DISTRICT COURT:      Okay.

. . .

DEFENDANT:      The court isn't properly set.

DISTRICT COURT:      I just want to make sure, sir, that I have a clear understanding of what you want in terms of your legal representation, Mr. Tillman.  Can you explain that to me, sir?

DEFENDANT:      I want to know what criminal jurisdiction you operating under.

DISTRICT COURT:      [W]e're not getting into the jurisdictional questions right now.  Can you answer my question about what you are asking for in terms of your representation?

THE DEFENDANT:      I already filed motions to remove [S.G.] because his unethical practices.  Affidavits have been supported with that.  And the chief judge—I wrote the chief judge as well on recusing you.  I even talked to you about recusing you too.  [I have] talked to you in the courtroom about recusing that you refused to recuse—you remove yourself.

THE COURT:      Well, I believe last time we talked, I asked you what the basis for removal of me is and you were silent, Mr. Tillman.

THE DEFENDANT:      The Court is improperly set.

THE COURT:      Okay.

Tillman then restated his position that S.G. was tainted by the public defender's

office's alleged conflict of interest; he identified no other conflict of interest that would

7

prevent S.G. from representing him. As it did when it denied Tillman's request for substitute counsel based on the same conflict of interest rationale in May 2023, the district court explained that S.G. was not part of the public defender's office but rather outside counsel.

Tillman then stated he was asking to remove S.G. "under ineffective assistance of counsel." He suggested that the State was withholding evidence and that S.G. had failed to take action to compel disclosure of the evidence. Tillman also claimed that the staff at the Ramsey County jail refused to permit him to review the evidence the State had produced. The district court asked S.G. to respond. S.G. stated that several months earlier, Tillman requested a copy of everything the State produced in discovery. S.G. confirmed with the assigned paralegal that Tillman had been given all discovery the State had produced—"any video, every document we have"—and stated that the public defender's office made a computer available to Tillman to review the materials. He acknowledged the jail had its own rules about providing Tillman with access to the materials. The district court accepted S.G.'s confirmation that Tillman received all discovery in the case, acknowledging that there may be "an ongoing issue [with the jail] about whether [Tillman's] been able to review it." Tillman again asserted that S.G. had engaged in unethical practices, but, as before, he provided no explanation other than referring to his "recently filed affidavits."

Following the September hearing, the district court issued an order addressing a number of ex parte motions that Tillman submitted to the Ramsey County court administrator. Among the orders addressed in the motion was the September 2023 ex parte

8

motion, supported by the inmate affidavits, asserting that S.G. engaged in unethical practices by speaking with a Ramsey County jail guard about Tillman's case. The district court did not grant Tillman's request for substitute counsel.

Tillman renewed his request for substitute counsel at a January 2024 hearing. Tillman raised the same complaints that he raised previously and did not provide any more information or explanation than in prior hearings and ex parte filings. The district court reminded Tillman that it had previously refused to grant his request and set a trial date for March 11, 2024.

The weekend before trial, the district court received a letter from Tillman stating his desire to discharge S.G. and proceed pro se. On the morning of trial, the district court read the letter into the record and asked Tillman if he still wished to represent himself. Tillman stated that he did.

The district court expressed concern that Tillman was "facing some very serious charges and [wanted] to make sure that [Tillman had] legal representation" if he so chose. The district court told Tillman that it wanted to make sure that he understood the seriousness of the charges against him and provided Tillman with a Form 11 Petition to Proceed as Pro Se Counsel, instructing Tillman to go through the form with S.G. during a recess.[1]

After a recess to allow Tillman to review and complete the form with S.G., Tillman returned with a signed Petition to Proceed as Pro Se Counsel. He testified under oath that

---

[1] *See* Minn. R. Crim. P. Form 11.

he had read the document thoroughly and carefully and (with one exception) that he understood the document.

The exception concerned the charges against him. On the form, Tillman stated that "I understand that I have been charged with the crime(s) of *2nd degree Murder* alleged to have occurred on or about *May 20th*, in *Ramsey* County, Minnesota."[2] Under questioning, Tillman explained that he contested the State's first-degree murder indictment because it lacked probable cause. Tillman testified, however, that he understood the State had indicted him on a charge of first-degree murder, and he did not deny that at the time he made the waiver of counsel that charge remained pending. Tillman specifically waived his right to representation by counsel on the first-degree murder charge.

The district court also inquired about Tillman's answer to question 16 on the Petition to Proceed as Pro Se Counsel. On the form, Tillman attested that he understood "[t]hat the maximum statutory penalty that the Court could impose for this crime . . . is imprisonment for *Murder* years."[3] Over several pages of transcript, S.G. explained that Tillman faced a mandatory life sentence if convicted of first-degree murder. Tillman responded that he understood that, if convicted, he could be sentenced to life without the possibility of parole. The State also explained that the "top count is first degree [murder] with premeditation and the possible sentence is life without the possibility of parole. There are some first degrees that allow for the possibility of parole. This is not one of those."

---

[2]     The italicized words indicate words Tillman filled in on blank spaces on the form.

[3]     Again, the italicized word indicates the word Tillman wrote on a blank space on the form.

The district court told Tillman that the law prescribes a sentence of life without the possibility of being released for a conviction of first-degree premeditated murder. Tillman stated that he "underst[ood] that's what [S.G.] believe[d] that that's what the consequence is" and "believe[d] that that's what the State has known the law to be."

Following the inquiry, the district court found Tillman's waiver of counsel competent, intelligent, knowing, and voluntary. The district court appointed S.G. as advisory counsel.

On the same morning that Tillman requested to represent himself, and before the district court granted that request, the parties and district court also discussed Tillman's continued complaint that he lacked access to discovery materials. The State asserted that jail records showed that the jail granted the public defender's office permission to provide Tillman with the discovery on multiple occasions; that the State provided the jail with an external storage device containing all the discovery, including videos, to give to Tillman; that Tillman refused to sign an acknowledgment that he received the discovery; and that the jail provided Tillman with the discovery anyway, but Tillman was unwilling to look at it. The State observed that Tillman was often in segregated confinement for behavioral issues. S.G. told the district court (as he had at an earlier hearing) that he confirmed three times with the public defender paralegal that Tillman had all discovery documents and videos.

The district court found that the State's and S.G.'s assertions "[we]re credible based on the information that ha[d] been provided both from Mr. Tillman and from the attorneys

and f[ou]nd that that discovery ha[d] been provided per Mr. Tillman's request to him at the jail and that any failure to review—any failure to view that [wa]s on Mr. Tillman."

After the district court granted Tillman's request to represent himself, Tillman told the court he was unprepared to proceed to trial and present a complete defense. At the urging of the State, the district court agreed to delay jury selection for a day and a half but denied Tillman's request for a further delay because Tillman had been provided all the discovery materials in the case; because his advisory counsel, S.G., had prepared to try the case; and due to concerns about Tillman's dilatory conduct.

Tillman represented himself through jury selection and the first day of trial. On the second day of the State's case-in-chief, Tillman requested that S.G. resume representation. The district court granted the request and S.G. represented Tillman for the remainder of the trial.

Tillman did not assert a claim of self-defense and did not dispute that he shot Ellis-Strong. Testifying in his own defense, Tillman told the jury that he encountered Ellis-Strong at the light-rail station the night of the shooting and that they argued about a phone number. Tillman said that Ellis-Strong threatened to kill him and that he took the threat seriously because Ellis-Strong had a violent reputation. He testified that he "felt at that moment I got to stop [Ellis-Strong] because he's a threat and I don't want him to come back and get me." He told jurors that the shooting "happened exactly like [they] saw on the video."

The jury found Tillman guilty of first-degree premeditated murder, second-degree intentional murder, and ineligible possession of a firearm. The district court sentenced

12

Tillman to life without the possibility of release for the first-degree murder conviction, imposed no sentence for the second-degree murder conviction, and sentenced Tillman to 60 months for the unlawful possession conviction, to run concurrent with the life sentence. This direct appeal followed.

**ANALYSIS**

Tillman raises two claims through his attorney. First, Tillman argues that the district court failed to conduct a "searching inquiry" before denying his requests for substitute counsel and that we must remand the case to the district court to allow for such inquiry. Second, Tillman contends that he is entitled to a new trial because he did not validly waive his right to counsel. In a pro se supplemental brief, Tillman raises several other claims.

I.

We begin with Tillman's claim that the district court abused its discretion when it denied his request for substitute counsel. We review a district court's denial of a request for substitute counsel for an abuse of discretion. *See State v. Clark*, 722 N.W.2d 460, 464 (Minn. 2006). "A district court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *State v. Guzman*, 892 N.W.2d 801, 810 (Minn. 2017).

A.

The United States and Minnesota Constitutions guarantee a criminal defendant the right to the effective assistance of counsel. U.S. Const. amend. VI; Minn. Const. art. I, § 6. An indigent defendant has the right to appointed counsel but does not have an "unbridled right" to counsel of their choice. *State v. Worthy*, 583 N.W.2d 270, 278 (Minn. 1998).

13

Rather, a district court must grant a defendant's request for substitute appointed counsel "only if exceptional circumstances exist and the demand is timely and reasonably made."[4] *State v. Munt*, 831 N.W.2d 569, 586 (Minn. 2013) (quoting *Worthy*, 583 N.W.2d at 278). Exceptional circumstances are "those that affect a court-appointed attorney's ability or competence to represent the client." *State v. Gillam*, 629 N.W.2d 440, 449 (Minn. 2001). The defendant bears the burden to establish that they are entitled to substitute counsel. *See Worthy*, 583 N.W.2d at 279.

When a defendant raises "serious allegations" about an attorney's ability or competence to represent the defendant, the district court must conduct a "searching inquiry" to determine whether exceptional circumstances exist entitling the defendant to substitute appointed counsel. *Munt*, 831 N.W.2d at 586.[5] The purpose of the searching inquiry is to ascertain the truth and scope of a defendant's allegation. *See United States v. Morrissey*, 461 F.2d 666, 670 n.6 (2d Cir. 1972) (explaining that, in light of allegations about attorney's conduct, the trial judge should have engaged in a more searching inquiry than the "perfunctory, surface inquiry to determine the truth and scope" of the defendant's reasons for seeking substitute counsel because of the "possibility that the defendant's

---

[4] There is no information in the record that the district court denied Tillman's requests for substitute counsel on timeliness grounds, nor did either party raise this issue before us. The sole issue for us to decide concerning Tillman's request for substitute counsel is whether exceptional circumstances justified the request.

[5] We used the phrase "serious allegations" in *Munt* to describe the threshold assertion that prompts the "searching inquiry" requirement described in the next paragraph. 831 N.W.2d at 586. We address whether Tillman's allegations were sufficient to require a searching inquiry in Part I.B. below.

allegation of inadequate representation might prove correct after detailed inquiry"); *Clark*, 722 N.W.2d at 464 (adopting the phrase "searching inquiry" from *Morrissey* and stating that a "searching inquiry" may be required when a defendant "voices serious allegations of inadequate representation"). Accordingly, when a defendant requests substitute appointed counsel, the district court must ask sufficient questions about the "serious allegations" to determine, based on the information offered and the court's knowledge of the record, whether the defendant's allegations are true and present exceptional circumstances calling into question the appointed attorney's ability and competence. The district court's inquiry must be commensurate with the specificity of the defendant's allegations, the defendant's responses during the inquiry, and the record support for the claims. *See Munt*, 831 N.W.2d at 587; *Clark*, 722 N.W.2d at 464–65.

## B.

We first address whether Tillman articulated serious allegations that S.G. lacked the ability or competence to represent him. Over the course of his pretrial proceedings, Tillman alleged that S.G. had a conflict of interest, was constitutionally ineffective, and violated his ethical obligations to keep attorney-client communications confidential. Tillman contends that each of these allegations was sufficiently serious to warrant a searching inquiry. The State disagrees, arguing the allegations were too generalized and lacking in specific detail to be considered serious. The State sets the bar too high.

We conclude that Tillman's allegations warranted additional inquiry because allegations that a lawyer has a conflict of interest, is ineffective, or violated the attorney-client privilege, on their face, amount to "serious allegations" implicating an attorney's

15

ability and competence to represent their client. *See Wood v. Georgia*, 450 U.S. 261, 271 (1981) (holding that the Sixth Amendment provides a "right to counsel that is free from conflicts of interest"); *Taylor v. State*, 887 N.W.2d 821, 823 (Minn. 2016) (stating that the United States and Minnesota Constitutions provide criminal defendants "the right to the *effective* assistance of counsel" (emphasis added) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984))); *State v. McNeilly*, 6 N.W.3d 161, 184 (Minn. 2024) (noting that an attorney "can only effectively fulfill [their] roles as counselor, intermediary, and advocate if the client, assured of confidentiality, is wholly free to completely and candidly disclose all the facts, favorable or unfavorable" (citation omitted) (internal quotation marks omitted)). In other words, Tillman's allegations were sufficient to require the district court to ask for more information to assess the scope and truth of Tillman's stated concerns and whether the allegations presented exceptional circumstances calling into question S.G.'s ability and competence to represent Tillman.

C.

Next, we must determine whether the district court conducted a searching inquiry into Tillman's allegations. We conclude that it did.

Tillman requested substitute counsel on several occasions. He offered three reasons for his request.

First, Tillman claimed that he was entitled to substitute counsel because S.G. had a conflict of interest. He raised this concern at the May 2023 hearing. In response to district court questions, Tillman never identified a specific conflict of interest that prevented S.G. from representing him. Rather, Tillman complained that he had a conflict with the Ramsey

16

County Public Defender's Office generally. The record reveals that the district court had a full understanding of the basis of Tillman's alleged conflict of interest complaint against the Ramsey County Public Defender's Office. On the basis of that information and Tillman's failure to identify any specific conflict of interest preventing S.G. from representing him, in May 2022, the district court denied Tillman's request for substitute counsel. The district court determined that S.G. was not tainted by any alleged conflict of interest between Tillman and the Ramsey County Public Defender's Office, reasoning that S.G. was an "outside conflict lawyer." At subsequent hearings, Tillman repeatedly raised the same conflict-of-interest complaint. Our review of the record shows that the district court asked enough questions to understand the truth and scope of Tillman's conflict of interest argument and determined that the Ramsey County Public Defender's Office's alleged conflict of interest did not taint S.G. because he was an outside conflict lawyer.[6] Accordingly, the district court conducted a searching inquiry before making its decision. It did not abuse its discretion in denying Tillman's request for substitute counsel based on S.G.'s alleged conflict of interest.

Second, Tillman claims that he was entitled to substitute counsel because S.G. provided ineffective assistance of counsel. Both of his own accord and in response to district court questions, Tillman explained his position that S.G. failed to compel the State to provide Tillman with complete discovery. The district court asked S.G. about this

---

[6] Tillman's argument focuses on whether the district court engaged in a searching inquiry. He does not challenge the district court's determination that S.G., as an outside conflict attorney, was not tainted by any alleged conflict of interest with the Ramsey County Public Defender's Office.

allegation as well. S.G. explained that the public defender's office provided all discovery—"any video, every document we have"—and that the public defender's office made a computer available to Tillman to review the materials.[7] Again, based on the parties' statements and responses to the district court's questions, the district court had a sufficient understanding of Tillman's ineffective assistance of counsel claim before it made its decision on substitute counsel. We discern no abuse of discretion in the district court's refusal to appoint substitute counsel based on the allegation that S.G. did not provide Tillman with discovery.

Third, Tillman claims that he was entitled to substitute counsel because S.G. breached his ethical duties. In response to the district court's questions, Tillman stated only that his claim was based on the two inmates' affidavits he submitted. Again, the district court asked enough questions to understand the truth and scope of Tillman's allegation of unethical conduct. The district court subsequently reviewed the affidavits and determined that the allegations—which did not show that S.G. shared confidential client communications—did not require appointing substitute counsel.

Tillman contends that the district court's questions were inadequate because the district court made only "general inquiries," and asked the wrong type of questions. The record shows that the district court repeatedly asked Tillman to explain the reasons he believed he was entitled to new representation:

[W]hat are you asking for today?

---

[7] As noted, at a subsequent hearing the State credibly explained that it provided an external storage device with all materials to Tillman in jail.

. . .

[H]elp me understand exactly what you're asking for today, sir.

. . .

I want to make sure I understand exactly what you're asking for.  Can you talk me through that . . . ?

. . .

I just want to make sure, sir, that I have a clear understanding of what you want in terms of your legal representation, Mr. Tillman.  Can you explain that to me, sir?

. . .

Can you answer my question about what you are asking for in terms of your representation?

These questions gave Tillman an opportunity to explain why he believed S.G.'s representation was inadequate.  Furthermore, the record shows that the district court persisted in its inquiry even though Tillman often refused to respond to basic questions or changed the subject in his responses.  More critically, the questions the district court asked produced answers and information sufficient for the court to understand Tillman's rationale for requesting substitute counsel, to assess the truth and scope of his reasons, and to determine whether exceptional circumstances existed that called into question S.G.'s ability or competence to represent Tillman.  Consequently, we find that the district court fulfilled its obligation to conduct a searching inquiry into the serious allegations that formed the basis for Tillman's request for substitute appointed counsel and conclude that the district court did not abuse its discretion.

## II.

Next, we turn to Tillman's argument that he did not validly waive his right to counsel and, accordingly, that the district court should not have allowed him to exercise his constitutional right to represent himself. Tillman argues his waiver was not voluntary, knowing, and intelligent because (1) the district court failed to ensure that Tillman understood the charges against him and the punishment he faced if convicted, (2) the district court did not review with Tillman the advantages and disadvantages of proceeding pro se, (3) the district court failed to ensure that Tillman was adequately prepared to proceed pro se, and (4) Tillman was forced to choose between proceeding with an attorney he believed was ineffective or proceeding without a lawyer.

Under the United States Constitution, a criminal defendant has the right to an attorney, *Gideon v. Wainwright*, 372 U.S. 335, 342–43 (1963), and the right to represent himself. *Faretta v. California*, 422 U.S. 806, 819–20 (1975). To reconcile the tension between these constitutional rights, we require a defendant who wishes to represent himself to validly waive the right to an attorney. *Worthy*, 583 N.W.2d at 275. A waiver of the right to counsel must be made voluntarily, knowingly, and intelligently. *See State v. Rhoads*, 813 N.W.2d 880, 884 (Minn. 2012); *State v. Bauer*, 245 N.W.2d 848, 859 (Minn. 1976).

To ensure a waiver is valid, a defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' " *State v. Camacho*, 561 N.W.2d 160, 173 (Minn. 1997) (quoting *Faretta*, 422 U.S. at 835). District courts "should

20

comprehensively examine the defendant regarding the defendant's comprehension of the charges, the possible punishments, mitigating circumstances, and any other facts relevant to the defendant's understanding of the consequences of the waiver." *Id.* Courts must consider "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Worthy*, 583 N.W.2d at 275–76 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). In addition, district courts should consider whether defendants have had a sufficient opportunity to consult counsel regarding their desire to represent themselves, *see id.*, and whether they were offered the benefit of standby counsel. *See State v. Krejci*, 458 N.W.2d 407, 414 (Minn. 1990).

We review a district court's findings on the facts and circumstances surrounding the defendant's waiver for clear error. *State v. Turner*, __ N.W.3d __, No. A24-1173, 2026 WL 758996, at *5 (Minn. Mar. 18, 2026). We review a district court's decision—based on those findings—that a defendant's waiver was knowing, voluntary, and intelligent de novo. *Id.*

A.

Tillman first argues that his waiver was invalid because the district court failed to ensure Tillman understood the charges against him and the possible punishment he faced if convicted. *See Camacho*, 561 N.W.2d at 173. To support his claim, Tillman calls our attention to his responses in the petition to represent himself. In the petition, Tillman wrote that he was charged with "2nd degree murder" and that the maximum statutory penalty for his offense was imprisonment for "Murder years." Tillman argues that his responses

21

indicate he did not understand that he was facing a sentence of life imprisonment without the possibility of release.

We disagree. After Tillman submitted his Petition to Proceed as Pro Se Counsel, he was questioned about whether he understood the charges he faced and the maximum statutory sentence for the top charge of first-degree premeditated murder. Tillman stated under oath: "I understand that I have been indicted for first-degree murder." He did not deny that at the time he made the waiver of counsel the first-degree murder charge remained pending. He specifically waived his right to representation by counsel on the first-degree murder charge. Moreover, at multiple pretrial hearings, Tillman acknowledged he had been indicted for first-degree murder. Finally, the transcript shows that Tillman's real concern was his assertion that the first-degree murder indictment lacked probable cause—an issue that the district court let Tillman challenge before voir dire was complete.

We have cautioned that to ensure a knowing and intelligent waiver of counsel district courts should examine defendants to determine their "comprehension of . . . the possible punishments." *Rhoads*, 813 N.W.2d at 886–87. Here, when S.G. asked if Tillman understood that the district court would impose a life sentence if he was convicted of first-degree premeditated murder, Tillman stated: "I understand that the penalty of first degree murder *could be* life without parole or it could be some number of years in prison." Tillman's response shows that he understood a life sentence was a possibility. Moreover, S.G., the State, and the district court directly and repeatedly told Tillman that the punishment for first-degree premeditated murder is life in prison without the possibility of release. Tillman unequivocally affirmed his desire to represent himself even though he

faced a first-degree murder charge, stating "[i]t doesn't change my desire to represent myself knowing that I was charged with first degree [murder]." *See Turner*, __ N.W.3d __, 2026 WL 758996, at *6–8.

B.

Next, Tillman argues that the district court failed to make him aware of the advantages of counsel and disadvantages of self-representation. *See Worthy*, 583 N.W.2d at 276. We conclude that the record shows that Tillman understood those trade-offs. Further, in our recent decision in *State v. Turner*, we recognized that failure to expressly provide each of the advisories in Minnesota Rule of Criminal Procedure 5.04 regarding waiving counsel does not automatically mean a waiver is constitutionally invalid. *Turner*, __ N.W.3d __, 2026 WL 758996, at *6–7 (stating that a district court's failure to expressly advise a defendant about the nature of the charges, among other things, does not render a waiver constitutionally invalid).[8]

Tillman's Petition to Proceed as Pro Se Counsel itself informs our decision. The petition provides that the signing party understands that if they waive the right to counsel and proceed pro se they will be bound by the same rules as an attorney and be responsible for preparing and trying their case. The petition language also confirms that the defendant understands that trying a case includes filing motions, examining witnesses, and making objections. The record reflects that Tillman reviewed the petition with counsel prior to

---

[8]    As in *Turner*, Tillman does not argue that the district court's failure to provide each of the advisories in Minn. R. Crim. P. 5.04 automatically invalidated his waiver of counsel. *Turner*, __ N.W.3d __, 2026 WL 758996, at *7 n.4.

signing. Tillman stated under oath that he reviewed the petition and understood its contents. As discussed above, the petition and Tillman's subsequent testimony demonstrate that he understood the charges against him and the potential sentence he faced. *See id* at *7. After Tillman submitted the petition, the district court specifically asked him whether he had any questions about it and explained unclear provisions until Tillman confirmed that he had no further questions.

Furthermore, because Tillman had actively participated in pretrial proceedings while represented by S.G. and other lawyers for several years before his decision, and because he consulted with S.G. when filling out his petition prior to waiving his right to counsel, we may "reasonably presume that [Tillman] was informed of all information necessary for a valid waiver of counsel." *Id.* at *6 (citation omitted) (internal quotation marks omitted); *see Worthy*, 583 N.W.2d at 276; *State v. Brooks*, 838 N.W.2d 563, 572 (Minn. 2013) (stating that a defendant's opportunity to consult counsel about an issue supports the conclusion that the defendant made a voluntary decision). Nothing in the record undermines that presumption.

C.

Tillman contends that the district court was obligated to reject his waiver because Tillman stated he was unprepared to present a complete defense and because the district court knew Tillman had not seen all the State's evidence. Again, we disagree.

Tillman did not assert that he was unprepared to go to trial and present a complete defense until *after* the district court accepted his waiver of counsel. But even if he had raised the question earlier, the district court found that Tillman had been provided with all

24

the documents necessary to prepare for the trial and had engaged in dilatory conduct with regard to discovery. The record supports those findings and the district court's credibility findings are not clearly erroneous. The district court delayed the beginning of trial for a day and half to allow Tillman to prepare for trial and consult S.G. as advisory counsel. Following that delay, the district court allowed Tillman to challenge probable cause for his first-degree murder indictment. The district court appointed S.G., who had prepared for trial, as advisory counsel. These facts demonstrate that the district court took considered and appropriate steps to ensure Tillman was prepared for trial in accepting his waiver of counsel.

D.

Finally, Tillman argues that his waiver of counsel was involuntary because he was forced to choose between representing himself at trial or proceeding with a lawyer—S.G.— who was not able and competent to represent him. We conclude Tillman did not face such a choice. As discussed in Part I, Tillman failed to establish that S.G. was not able or competent to represent him. Tillman's allegations against S.G. amount to, at most, dissatisfaction with S.G. Dissatisfaction is not "good cause" to discharge appointed counsel, *Worthy*, 583 N.W.2d at 277, and we recently reaffirmed that "[a] defendant's refusal without good cause to proceed with able appointed counsel constitutes a voluntary waiver of that right." *State v. Woods*, 961 N.W.2d 238, 247 (Minn. 2021) (quoting *Krejci*, 458 N.W.2d at 413). The district court did not abuse its discretion when it determined that Tillman was not entitled to substitute counsel because S.G. was able and competent to represent Tillman. Accordingly, Tillman did not face a Hobson's choice between

25

representing himself and proceeding with a lawyer who was not able and competent to represent him.

III.

Tillman filed a supplemental pro se brief raising multiple other claims. We conclude that none of Tillman's supplemental claims have merit.

A.

Tillman argues that we must grant him a new trial because the district court judge was biased against him. A judge may not preside over any criminal proceeding if she is disqualified from doing so under the Code of Judicial Conduct. Minn. R. Crim. P. 26.03, subd. 14(3); *State v. Mouelle*, 922 N.W.2d 706, 712–13 (Minn. 2019). Whether a judge has violated the Code is a question of law that we review de novo. *State v. Dorsey*, 701 N.W.2d 238, 246 (Minn. 2005). Under the Code, a judge must disqualify himself or herself from "any proceeding in which the judge's impartiality might reasonably be questioned." Minn. R. Jud. Conduct 2.11. Impartiality requires absence of "actual bias against the defendant or interest in the outcome of his particular case." *Munt*, 831 N.W.2d at 580 (citation omitted) (internal quotation marks omitted). In addressing claims of judicial impartiality, we ask whether an objective, unbiased layperson, with full knowledge of the facts and circumstances, would reasonably question the judge's impartiality. *Mouelle*, 922 N.W.2d at 713. We review whether the district court judge's impartiality might reasonably be questioned de novo. *Id.*

"[W]e presume that a judge has discharged her duties properly." *Hannon v. State*, 752 N.W.2d 518, 522 (Minn. 2008). To overcome that presumption, a defendant must

26

point to evidence of the judge's favoritism or antagonism. *State v. Burrell*, 743 N.W.2d 596, 603 (Minn. 2008). "The mere fact that a party declares a judge partial does not in itself generate a reasonable question as to the judge's impartiality." *State v. Schlienz*, 774 N.W.2d 361, 366 (Minn. 2009) (citation omitted) (internal quotation marks omitted). Moreover, a judge's adverse rulings alone are insufficient to establish judicial bias. *Mouelle*, 922 N.W.2d at 716.

Tillman points to two acts which he claims show the district court had actual bias against him. First, Tillman argues that the district court demonstrated bias in denying his request to appoint substitute counsel to replace E.K., the initial public defender appointed to his case. He argues that in making that determination, the district court referred to E.K. as "a good lawyer," and that the district court ruled against him even though it "didn't have [the] evidence" necessary to "fairly consider [E.K.'s] ability and competence to represent" him.

The record does not support Tillman's assertions. As discussed above, a district court must grant a defendant's request for substitute appointed counsel only if exceptional circumstances exist that affect an appointed lawyer's ability or competence to represent the client. *Munt*, 831 N.W.2d at 586. The defendant bears the burden of demonstrating such exceptional circumstances. *See Worthy*, 583 N.W.2d at 279. Tillman based his request for substitute counsel on an alleged personal relationship with E.K. When the district court asked him to explain further, Tillman refused to provide any details about the relationship. E.K. unequivocally denied any personal relationship. The district court thus denied Tillman's request because Tillman did not establish that he had a personal relationship with

27

E.K.  Moreover, the record does not include any evidence of the district court referring to E.K. as "a good lawyer."  We conclude that the district court did not show any actual bias in determining that there were no exceptional circumstances justifying substitute counsel in Tillman's case and that no objective, unbiased layperson would perceive bias in that decision.  Tillman's disagreement with the decision is not enough to require the district court to recuse from the case.

Second, Tillman argues the district court demonstrated bias when it found him competent to stand trial.  Again, this argument does not withstand scrutiny.  The district court ordered a competency evaluation.  Tillman refused to meet with the evaluator.  Relying on Tillman's available records, the evaluator issued a competency report finding no reason to conclude Tillman was incompetent and that Tillman "d[id] not demonstrate impairments in his abilities to consult with his attorney, participate in his defense, or factually understand proceedings as a result of mental illness."  Tillman did not object when the State asserted that the evaluator's report was sufficient.  The district court found Tillman competent to stand trial.  Again, we conclude that the district court did not show any actual bias in making that determination and that no objective, unbiased layperson would perceive bias or antagonism against Tillman in that decision.

B.

Tillman argues that the district court erred by denying his motion to dismiss the grand jury indictment.  Tillman moved to dismiss the indictment on the second day of jury selection.  Tillman argued in the district court—and argues to us—that the indictment was

28

invalid because one of the grand jurors exhibited bias and that the bias tainted the grand jury panel.

"An indictment carries with it a presumption of regularity." *State v. Miller*, 754 N.W.2d 686, 697 (Minn. 2008). A defendant challenging an indictment therefore "bears a heavy burden," and "it is a rare case where an indictment will be invalidated." *State v. Lynch*, 590 N.W.2d 75, 79 (Minn. 1999). The defendant's burden is heightened when he is later found guilty beyond a reasonable doubt after a fair trial on the merits. *See id.* (stating that a trial jury's finding of guilt under the reasonable-doubt standard supports a grand jury's finding under the lower standard of probable cause).

A defendant may object to a grand juror for cause if the grand juror "is of a state of mind in reference to the case or to either party which shall satisfy the court, in the exercise of a sound discretion, that the juror cannot act impartially and without prejudice to the substantial rights of the party objecting." Minn. Stat. § 628.54(7); *see* Minn. R. Crim. P. 18.09, subd. 2(b) (stating that the fact that an individual juror is not legally qualified may be grounds for a motion to dismiss the indictment). Because neither a defendant nor their counsel is allowed at a grand jury proceeding, "[o]bjections to the grand jury panel and to individual grand jurors must be made by motion to dismiss the indictment." Minn. R. Crim. P. 18.09, subd. 1.[9] "An indictment must *not* be dismissed on the ground that one

---

[9] Typically, a motion to dismiss an indictment must be brought by motion filed three days before the omnibus hearing unless that time is extended for good cause. *State v. Whittaker*, 568 N.W.2d 440, 448 (Minn. 1997) (citing Minn. R. Crim. P. 10.03, 17.06). In this case, the district court heard Tillman's motion—outside the presence of potential jurors—while voir dire was ongoing. Although Tillman did not bring his motion until after

29

or more of the grand jurors was not statutorily qualified if it appears from the records that 12 or more qualified jurors concurred in finding the indictment." Minn. R. Crim. P. 18.09, subd. 2 (emphasis added); *see McIlvaine v. State*, 279 N.W.2d 834, 836 (Minn. 1979) (stating that an indictment is valid so long as 16 grand jury members were present and at least 12 qualified jurors voted to indict).

Tillman's argument is based on the fact that, during grand jury proceedings, the prosecutor asked if any of the grand jurors knew a person named Shawn Michael Tillman. One of the grand jurors responded: "I have taken care of a patient at Stillwater Correctional Facility with the last name of Tillman. I'm not familiar with the first name of that patient." No information was provided to grand jurors that Tillman was incarcerated at Stillwater on other convictions before killing Ellis-Strong.

Tillman contends that the grand juror's potential bias invalidates the indictment. Tillman is incorrect. Even if the juror was not qualified due to bias (something we do not need to reach), the grand jury consisted of at least 16 jurors who unanimously indicted Tillman, meaning that at least 12 jurors voted to indict. *See* Minn. R. Crim. P. 18.09, subd. 2 ("An indictment must not be dismissed on the ground that one or more of the grand jurors was not statutorily qualified if it appears from the records that 12 or more qualified jurors concurred in finding the indictment."). The district court had no power to dismiss the indictment under those circumstances.

---

his omnibus hearing, we need not decide the timeliness issue here because, even assuming it was timely, we affirm the motion's denial.

Tillman also argues that the juror's answer prejudiced him because the answer suggested to the other jurors that Tillman was previously incarcerated. We are not convinced.

We faced a similar argument in *State v. Whittaker*. 568 N.W.2d 440, 447–49 (Minn. 1997). Whittaker claimed that he was denied due process based on two grand jurors who knew the murder victim and/or a witness who testified during the grand jury proceedings in his case. *Id.* at 447. Whittaker asserted that there had been no meaningful inquiry into the grand jurors' partiality. *Id.* at 448. He also contended that the possibility that two biased grand jurors could have influenced the other grand jurors during deliberations violated his due process rights. *Id.* Applying an abuse of discretion standard, we rejected this argument based on the presumption of regularity that attaches to a grand jury indictment, especially where the indictment is challenged after the defendant is found guilty beyond a reasonable doubt in a fair trial. *Id.*

The facts here are a bit different than *Whittaker*. Here, the grand jury actually heard the grand juror say that she had treated an individual named Tillman at Stillwater prison. Nonetheless, we conclude that statement alone does not establish that other members of the grand jury were improperly influenced to indict Tillman, considering all the other evidence it received, including the video footage. The grand juror did not conclusively identify Tillman as the patient she treated at Stillwater. The grand jury had no evidence Tillman was an inmate at Stillwater at any time. And each of the grand jurors stated that they were able to consider the evidence fairly and impartially. Finally, Tillman was

ultimately found guilty beyond a reasonable doubt in a jury trial. *See id.* (stating that courts rarely invalidate an indictment after the defendant is found guilty in a fair trial).

C.

Tillman argues that the district court violated his due process right to present a complete defense by forcing him to proceed to trial unprepared. The Due Process Clauses of the United States and Minnesota Constitutions guarantee a criminal defendant's right to present a complete defense. U.S. Const. amend. XIV; Minn. Const. art. I, § 7; *see also State v. Atkinson*, 774 N.W.2d 584, 589 (Minn. 2009) ("A defendant has the constitutional right to present a complete defense.").

Tillman first requested to represent himself in a letter delivered to the district court the weekend before trial. On the following Monday morning (the first day of trial), the district court heard and granted Tillman's request. *Supra* Part II. Immediately after the district court granted his request, Tillman claimed he was unprepared to start trial that day because he had been denied access to certain evidence. The district court agreed to delay the start of jury selection for a day and a half to provide more time for Tillman to prepare. But the district court found Tillman's claim that he had been denied access to discovery unfounded. The district court found it credible that the State provided the jail with an external storage device with all the discovery, including videos. It also credited Ramsey County jail records which showed that the jail repeatedly gave the public defender's office permission to provide Tillman with discovery, that Tillman refused to sign an acknowledgment to that effect, that the jail nevertheless provided Tillman with the discovery, and that Tillman was unwilling to review it. The district court also found

32

credible S.G.'s statements that the public defender's office provided Tillman with all discovery, including documents and videos, and made a computer available for him to review the materials. Indeed, as early as the spring of 2023—nearly a year before trial— S.G. confirmed that Tillman had been given all the materials the State had provided. The district court was concerned with Tillman's dilatory conduct and determined, based on the record, that "any failure to view the discovery is on Mr. Tillman."

Based on our review of the record, the district court did not clearly err in determining that Tillman was prepared to proceed to trial. *See State v. Jones*, 848 N.W.2d 528, 533 (Minn. 2014) (stating that we review district court factual findings for clear error). Exercising an abundance of caution, the district court delayed the start of Tillman's trial by a day and a half to allow Tillman additional time to review the record and consult advisory counsel. The district court appointed S.G.—who had prepared for trial—as advisory counsel and, by the second day of the State's case, Tillman asked that S.G. take over his defense for the rest of the trial—a request the district court granted. Thus, we reject Tillman's claim that he was denied his right to present a full defense.

### D.

Tillman challenges the district court's denial of his request for a jury instruction on the lesser-included offense of first-degree heat-of-passion manslaughter. We review the denial of a lesser-included offense instruction for abuse of discretion. *State v. Dahlin*, 695 N.W.2d 588, 597 (Minn. 2005). If a district court's denial of a lesser-included instruction request was erroneous, we will only reverse if the defendant was prejudiced by the error. *Id.*

Even if a first-degree heat-of-passion manslaughter instruction should have been given (an issue we do not reach), Tillman was not prejudiced by any failure to do so. A defendant is not prejudiced by a district court's failure to give a heat-of-passion manslaughter instruction if the jury was presented with first-degree premeditated murder and second-degree intentional murder and finds the defendant guilty of first-degree premeditated murder. *See, e.g.*, *Phillips v. State*, 7 N.W.3d 577, 581 (Minn. 2024); *State v. Galvan*, 912 N.W.2d 663, 672 (Minn. 2018); *State v. Chavez-Nelson*, 882 N.W.2d 579, 591 (Minn. 2016); *Cooper v. State*, 745 N.W.2d 188, 194 (Minn. 2008). Here, the district court instructed the jury on both first-degree premeditated murder and second-degree intentional murder and the jury returned verdicts of guilty on both charges. Under our case law, Tillman suffered no prejudice.

## E.

Tillman argues the district court erroneously excluded evidence that was necessary to his presentation of a complete defense. We review evidentiary rulings for an abuse of discretion. *State v. Penkaty*, 708 N.W.2d 185, 201 (Minn. 2006). This is so even when the defendant claims the exclusion of evidence deprived him of his constitutional right to present a complete defense. *Id.* Tillman challenges two of the district court's evidentiary rulings.

## 1.

First, Tillman argues that the district court abused its discretion when it denied his request to introduce evidence of specific prior acts of violence Ellis-Strong had committed. Tillman sought to introduce the evidence because it supported his claim that, when he shot

34

Ellis-Strong, he knew that Ellis-Strong had a general propensity for violence and that he was afraid that Ellis-Strong, at some future time, would kill him if he did not strike first. Importantly, at trial Tillman did not claim that he was acting in self-defense when he killed Ellis-Strong.[10]

The district court determined that the prejudicial impact of the evidence—the risk of confusing and misleading the jury—outweighed its probative value. In particular, the district court was "concerned that the jury will think this is a self-defense case when we have all agreed from the very beginning that it is not."

The district court did not abuse its discretion in refusing to admit the prior acts of violence evidence. The evidence of Tillman's offense showed that Tillman and Ellis-Strong engaged in a heated discussion from opposite sides of the light-rail tracks. Tillman crossed the tracks, took out his gun, and shot Ellis-Strong several times. There is no evidence that Ellis-Strong had a weapon. More critically, Tillman did not assert self-defense to justify his actions, and he did not argue that Ellis-Strong caused him to immediately fear death or great bodily harm. *See Ezeka v. State*, 16 N.W.3d 768, 784 (Minn. 2025) (outlining the requirements of self-defense: (1) the absence of aggression or

---

[10]     At trial, Tillman relied on our decision in *State v. Bland*, 337 N.W.2d 378 (Minn. 1983), to support his request to admit evidence of Ellis-Strong's prior bad acts. In *Bland*, a self-defense case, we held that, "when self-defense is asserted, evidence of a specific act is admissible only to show that a defendant reasonably feared great bodily harm, provided that the defendant proves that he knew of the specific act at the time of the alleged offense." *State v. Zumberge*, 888 N.W.2d 688, 694 (Minn. 2017) (discussing our holding in *Bland*). We note that in *State v. Zumberge*, we observed that "[l]ike all evidence, specific-acts evidence offered to show that a defendant reasonably feared great bodily harm must also be relevant and more probative than prejudicial." *Id.* (citing *Penkaty*, 708 N.W.2d at 203).

provocation on the part of the defendant, (2) the defendant's actual and honest belief that he [or another] was in imminent danger of great bodily harm, (3) the existence of reasonable grounds for that belief, and (4) the absence of a reasonable possibility of retreat to avoid the danger); Minn. Stat. § 609.065 (defining the justifiable taking of life). At most, Tillman feared that Ellis-Strong would potentially harm him at some unspecified time in the future; he neither alleged nor established facts that satisfied the requirements to present a defense of self-defense.

2.

Tillman also challenges the district court's decision to exclude video from an officer's body-worn camera in which an individual identified only by his first name (and referred to here as "R.") is shown telling a police officer what he saw and heard on the platform before Tillman shot Ellis-Strong. In the video, the individual is at times difficult to understand, but he seems to describe people arguing about a phone number, Ellis-Strong challenging Tillman to come to his side of the platform to fight, Tillman approaching Ellis-Strong and drawing a weapon, and someone yelling, "Shoot that mother****er," and then "pop, pop, pop."

Tillman sought to introduce the statements in the video to corroborate Tillman's testimony about the argument preceding the shooting.[11] Because he fled the scene immediately after the shooting and did not speak with R., Tillman argued that the statistical improbability of R. and Tillman describing the argument the same way makes R.'s

---

[11] Tillman also proposed that because R.'s statements were occasionally unintelligible, Tillman would interpret them for the jury and testify about what he believed R. said.

36

statement probative of Tillman's general credibility. Tillman argued that the video statements were not hearsay because he was not introducing them for their truth but only to corroborate the truth of his own testimony. Tillman also asserted that the statements in the video impeached the testimony of an earlier witness. The State objected.

The district court sustained the State's objection, noting the lack of a corroboration exception in the hearsay rules and finding that the defense intended the video "for some level of truthfulness." The district court also determined that the statements in the video did not impeach the testimony of the prior witness.

We conclude the district court did not abuse its discretion in refusing to admit the statements in the video. The statements are hearsay. The only way the statements could corroborate Tillman's testimony is if the jury believed the statements in the video were true. Minn. R. Evid. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Tillman does not identify any exception to the hearsay rule that applies to the statements. And based on our review of the record, the evidence supports the district court's conclusion that the statements in the video are not impeachment evidence.[12]

---

[12] In a related argument, Tillman argues that the prosecutor committed misconduct by removing the body-worn camera video from the record and replacing it with a transcript. Tillman is mistaken. The body-worn camera video was marked as Exhibit 200-A. It remains in the record. At some point that is unclear from the record, a transcript of the statements in the video was prepared. Because the district court ruled that the statements in the video were not admissible, neither the video nor the transcript was ever entered into evidence.

F.

Tillman challenges the district court's denial of his motion for a mistrial. We review the denial of a motion for a mistrial for an abuse of discretion. *State v. Jorgensen*, 660 N.W.2d 127, 133 (Minn. 2003). Abuse of discretion is the proper standard because "the district court is in the best position to evaluate the prejudicial impact, if any, of an event occurring during the trial." *State v. Bahtuoh*, 840 N.W.2d 804, 819 (Minn. 2013).

At trial, the State called a Metro Transit police officer to testify about his role in the investigation immediately following the shooting. The officer testified that, on the night of the incident, he reviewed the video of the shooting in order to provide responding officers a description of the suspect. He said that images from the camera are "pretty clear." The officer testified as follows:

> THE STATE: Did you see anything relevant [in the video footage]?
>
> OFFICER: Yeah. So I pulled up the CCTV footage and I did playback for the last couple of minutes and I observed *Mr. Tillman* standing at the edge of the platform and he was wearing a white sweatshirt, dark pants, white shoes. And he appeared to be putting on gloves and then he appears to rack a firearm and then he proceeds to walk onto the platform and shoot the victim six times. The victim falls to the ground and then *Mr. Tillman* runs off the platform westbound on the street, towards Wabasha.
>
> THE STATE: When you see that as a patrol officer, what kind of information—I mean, do you take that information, try to share it with other officers [at] the scene?
>
> OFFICER: Yeah. So I took a still shot with my department issued phone and I sent to it the officers or who were arriving or who were already on scene so they know who to look for.
>
> THE STATE: What did you take a still shot of?
>
> OFFICER: *The defendant*.

THE STATE:         And was it of the—specifically, was it of the shooter that you saw in the footage?

OFFICER:   Yes.

(Emphases added.)  Tillman did not immediately object.  After the district court dismissed the witness and excused the jury for lunch, Tillman moved for a mistrial, arguing that, by identifying the person in the video as "Tillman" and "the defendant," the officer "prejudiced the jury by volunteering an improper opinion about identity" in violation of Minn. R. Evid. 701.  The district court denied the mistrial motion but gave the jury a curative instruction.

When a party requests a mistrial based on the admission of inadmissible and prejudicial evidence, we will not reverse a conviction based on the district's court refusal to declare a mistrial unless "there is a reasonable probability that the outcome of the trial would be different if the event that prompted the motion had not occurred."  *State v. Manthey*, 711 N.W.2d 498, 506 (Minn. 2006) (citation omitted) (internal quotation marks omitted); *see also State v. Jaros*, 932 N.W.2d 466, 472–73, 476 (Minn. 2019) (explaining the rule articulated in *Manthey*).

Tillman himself testified that he shot Ellis-Strong and that it "happened exactly like [the jury] saw on the video."[13]  We conclude that there is no reasonable possibility that the

_____

[13]   Tillman also argues that the district court's curative instruction was improper.  After the district court denied the mistrial motion, Tillman asked the district court to instruct the jury to "disregard the identification of the defendant."  The district court declined to give the requested instruction but reminded the jury: "[Y]ou are the exclusive judges of the facts.  Your job will be to decide what facts have been proven by evidence admitted in this

39

outcome of the trial would have been any different had the transit officer not identified Tillman as the person in the video.

G.

Tillman argues that the prosecutor committed misconduct during his closing argument by making statements designed to inflame the passions of the jury and by referencing "contradictable testimonial statements." Tillman did not object to the prosecutor's statements at trial. We review unobjected-to prosecutorial misconduct under a modified plain-error standard. *State v. Epps*, 964 N.W.2d 419, 423 (Minn. 2021). Among other things, to prove plain error, a defendant must establish an error occurred. *Id.* (quoting *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998)).

Tillman does not clearly articulate his argument, but he appears to contend that the prosecutor committed misconduct by summarizing the evidence that was presented at trial and by referencing witness testimony that conflicted with Tillman's own testimony. This is not misconduct. We have said that prosecutors "have the right to present to the jury all legitimate arguments on the evidence, to analyze and explain the evidence, and to present

---

case. You and only you are the people that can decide what the facts are in this case." Tillman did not object to the instruction. He now argues the instruction was insufficient.

We review an unobjected-to instruction for plain error. *State v. Milton*, 821 N.W.2d 789, 805 (Minn. 2012). A challenged instruction is plain error if, among other things, "there is a reasonable likelihood that the giving of the instruction in question had a significant effect on the jury verdict." *State v. Gilleylen*, 993 N.W.2d 266, 280–81 (Minn. 2023) (citation omitted) (internal quotation marks omitted) (describing the substantial-rights prong of the plain-error test). For the same reasons that the denial of the mistrial motion was not prejudicial, any error in the district court's cautionary instruction (an issue we do not reach) did not affect the jury's verdict.

all proper inferences to be drawn therefrom." *State v. Wahlberg*, 296 N.W.2d 408, 419 (Minn. 1980). Accordingly, Tillman's argument lacks merit.

H.

Tillman argues that the district court committed reversible error by coercing the jury to reach a unanimous verdict. He bases his argument on a note the jury sent to the district court during deliberations. The note asked: "If the jury cannot come to a unanimous conclusion on a verdict, what happens? Can we agree that we cannot come to a unanimous conclusion?" Tillman claims the note demonstrates that the jury was deadlocked.

In response, the district court referred the jurors to the jury instructions and advised the jury:

> To reach a verdict of guilty—or excuse me, to reach a verdict, comma, whether guilty or not guilty, each juror must agree with that verdict. Your verdict must be unanimous. You should decide—discuss this case with one another and deliberate with a view toward reaching agreement, if you can do so without violating your individual judgment.
>
> You should decide the case for yourself, but only after you have discussed this case with your fellow jurors and carefully considered their views. You should not hesitate to reexamine your views and change your opinion if you become convinced they are erroneous. But should not surrender your honest opinion simply because other jurors disagree or merely to reach a verdict.[14]

The district court then instructed the jury to continue deliberating.

It is reversible error to coerce a jury toward a unanimous verdict by either telling the jury that a case must be decided, or by allowing the jury to believe that a deadlock is not an available option. *State v. Jones*, 556 N.W.2d 903, 912 (Minn. 1996). When

---

[14]     *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 3.02 (6th ed. 2015).

41

responding to a jury question, district courts have the discretion "to decide whether to amplify previous instructions, reread previous instructions, or give no response at all." *State v. Laine*, 715 N.W.2d 425, 434 (Minn. 2006) (citation omitted) (internal quotation marks omitted). We review a district court's instruction to continue deliberating for an abuse of discretion. *State v. Cox*, 820 N.W.2d 540, 550 (Minn. 2012).

Tillman's argument fails for two reasons. First, by asking what happens "*[i]f* the jury cannot come to a unanimous conclusion,*" (emphasis added), the jury did not indicate it was deadlocked—it sought guidance in the event of a future deadlock. *See id.* at 551 (concluding that a jury did not indicate deadlock by asking "[w]hat happens if we are unable to agree on the third charge"). Second, even if the jury was deadlocked, the district court has the discretion to refer the jury to its previous instructions. Indeed, we have expressly stated that it is appropriate to read CRIMJIG 3.02, the instruction upon which the district court's instruction was based, to potentially deadlocked jurors. *See State v. Martin*, 211 N.W.2d 765, 771–72 (Minn. 1973) (adopting procedures set forth in *Standards Relating to Trial by Jury* § 5.4 (A.B.A. 1968 (approved draft))—as proper for use with deadlocked jury); *Cox*, 820 N.W.2d at 551 (observing that the A.B.A. standards "are now reflected in CRIMJIG [3.02]"). The district court here followed established precedent for addressing a potentially deadlocked jury and we find that it committed no error.

I.

Lastly, Tillman argues that the district court improperly imposed an upward sentencing departure when it sentenced him to life without the possibility of release under

Minn. Stat. § 609.106, subd. 2(1), rather than "imprisonment for life," under Minn. Stat. § 609.185(a)(1). Tillman is incorrect.

Section 609.106 provides that when a "person is convicted of first-degree murder under section [609.185(a)(1)]," the district court "shall sentence [the] person to life imprisonment without possibility of release." Here, the jury found Tillman guilty of first-degree murder in violation of section 609.185(a)(1). Accordingly, the district court correctly sentenced him to life imprisonment without the possibility of release.

## CONCLUSION

For the foregoing reasons, we affirm Tillman's convictions.

Affirmed.